472 A.2d 1099

**COMMONWEALTH of Pennsylvania**

v.

**Rev. Daniel BERRIGAN, S.J., Rev. Philip Berrigan, Sister Anne Montgomery, Elmer H. Maas, Rev. Carl Kabat, John Schuchardt, Dean Hammer, Molly Rush, Appellants.**

Superior Court of Pennsylvania.

Argued May 10, 1983.

Filed Feb. 17, 1984.

Petition for Allowance of Appeal Granted June 27, 1984.

244

248

Ramsey Clark, New York City, for appellants.

Joseph J. Hylan, Assistant District Attorney, Norristown, for Commonwealth, appellee.

Before CERCONE, President Judge, and SPAETH, HESTER, BROSKY, WIEAND, BECK and JOHNSON, JJ.

BROSKY, Judge:

This appeal follows appellants' convictions by a jury on charges of burglary,[1] criminal mischief[2] and criminal con-

1. 18 Pa.C.S. § 3502.
2. 18 Pa.C.S. § 3304.

spiracy.[3] The incident leading to appellants' arrests occurred on September 9, 1981 when they entered a General Electric plant in King of Prussia, Pennsylvania and beat missile components with hammers. They also poured human blood on the premises. They were arrested at the factory some time later. No personal injuries occurred. Property damage apparently exceeded $28,000.[4]

At trial appellants did not deny having committed these actions, but sought to defend themselves by relying on Pennsylvania's justification statute.[5] While the trial judge agreed that the defense could be raised by appellants, he refused to permit them to present expert testimony to prove the defense, limiting them to their own testimony. It is this ruling that presents the primary issue before us. That is, "Did the trial court err in so limiting appellants' evidence?" Because we believe that the court was so in error, we reverse the judgments of sentence and remand for new trial.

Before us also are questions concerning the voir dire conducted in this case, the refusal of the trial judge to recuse himself and the issuance of the criminal informations.[6]

In Part I of the opinion we will discuss the justification defenses applicable to this case.

In the second section we will address appellants' allegations of error in the voir dire process. We agree with them to the extent that we, too, believe that the voir dire process should have been conducted in public and should have been conducted on an individual, rather than a group basis.

**3.** 18 Pa.C.S. § 903.

**4.** Appellants argue that the property damage assessment was too high because it did not include the salvageable value of the damaged missile shell.

**5.** 18 Pa.C.S. § 501 et seq.

**6.** Appellants raise other issues which we need not address in view of our disposition of the above recited questions.

250

Thirdly, we will discuss the question of whether the trial judge should recuse himself. We hold that the judge may not participate further in this case.

Finally, we will respond to appellants' contention with which we do not agree, that the criminal informations filed against them should be quashed as not having been signed by a duly authorized district attorney.

I.

At trial appellants sought to defend themselves on the grounds that their actions were justified as being necessary to avert the harm of nuclear war. Pennsylvania law provides a justification defense at 18 Pa.C.S. §§ 501, 503, 510.

The general justification defense is set out at Section 503 which provides.

§ 503. Justification generally

(a) General rule.—Conduct which the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable if:

(1) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged;

(2) neither this title nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and

(3) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.

(b) Choice of evils.—When the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for his conduct, the justification afforded by this section is unavailable in a prosecution for any offense for which recklessness or negligence, as the case may be, suffices to establish culpability.

Section 501 defines the terms believes or belief as "reasonably believes" or "reasonable belief."

■ We believe, however, that appellants were required to prove the elements of a more specific justification statute, found at Section 510 which states:

§ 510. Justification in property crimes

Conduct involving the appropriation, seizure or destruction of, damage to, intrusion on or interference with property is justifiable under circumstances which would establish a defense of privilege in a civil action based thereon, unless:

(1) this title or the law defining the offense deals with the specific situation involved; or

(2) a legislative purpose to exclude the justification claimed otherwise plainly appears.

In *Commonwealth v. Capitolo*, 324 Pa.Super. 61, 471 A.2d 462 (1984), we held that the appellants who had tried to prove justification in defense of charges of trespass on the grounds of a nuclear power plant, were required to meet the requirements of Section 510. We so hold in the instant case in which appellant's conduct involves damage to, intrusion on or interference with property.

In *Capitolo, supra*, 324 Pa.Superior Ct. 61, 471 A.2d 462, we explained that because "Section 503 contains a general principle applicable to all crimes ... it must yield to more specific formulations dealing with the particular situation posed in any concrete case." (citing Model Penal Code, Scope of Article 3, at 1). We therefore concluded that to the extent Sections 503 and 510 are consistent, the requirements of both must be met by defendants seeking to prove justification.

■ As to Section 503, the rationale behind its Model Penal Code origins and the case law make it quite clear that a defendant is justified in committing a crime if and only if each of four circumstances exist. They are:

(1) The actor must believe his actions to be necessary to avoid a harm or evil to himself or to another which is greater than that harm or evil in which his conduct will

result. This subjective belief must be held honestly and sincerely. 18 Pa.C.S. § 503(a)(1).

(2) Such a belief must also be determined to be an objectively reasonable one to hold. 18 Pa.C.S. § 501.

(3) No law "defining the offense provides exceptions or defenses dealing with the specific situation involved ..." 18 Pa.C.S. § 503(a)(2).

(4) "[A] legislative purpose to exclude the justification claimed [must] not otherwise plainly appear." 18 Pa.C.S. § 503(a)(3).

■ As to requirements three and four we note that neither the burglary statute nor any other section of Title 18 provides an exception or defense dealing with this specific situation. We will discuss the question of whether there exists a legislative purpose to exclude the defense, later in this opinion.

■ In *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), Justice Rehnquist, speaking for a majority of the United States Supreme Court, discussed limitations upon the scope of the common law defenses of duress and necessity. Justice Rehnquist said:

> We need not speculate now, however, on the precise contours of whatever defenses of duress or necessity are available against [particular criminal] charges. Under any definition of these defenses one principle remains constant: if there was a reasonable, legal alternative to violating the law, "a chance both to refuse to do the criminal act and also to avoid the threatened harm," the defenses will fail. LaFave & Scott [*Handbook on Criminal Law*, (1972)], at 379.

*Id.* at 410–411, 100 S.Ct. at 634–635. The Supreme Court stated further that the modern defense of justification in federal law is historically based in the common law defenses of duress and necessity. In Pennsylvania, however, the justification defense enacted by our General Assembly in § 503, taken from the Model Penal Code, is an expanded,

modern variant on the common law defense of necessity.[7] *Commonwealth v. Clark,* 287 Pa.Super. 13, 429 A.2d 695 (1981). Thus, the limitations on the common law defense as stated in *United States v. Bailey,* supra, while instructive, are certainly not binding on our understanding of Pennsylvania's statutory defense of justification.

■ Moreover, as to § 503, imminence is not a controlling factor. In Pennsylvania following the Model Penal Code approach, such factors are not controlling: "... [T]he actor's [reasonable] belief in the necessity [is] sufficient (assuming a valid choice of evils) .... Questions of immediacy and of alternatives have bearing, of course, [but only] on the genuineness of a belief in necessity ..." American Law Institute, Model Penal Code § 3.02, Commentary at 10 (Tent.Draft No. 8, 1958). *Cf. United States v. Bailey,* supra, (interpreting common law defense), see also *Commonwealth v. Capitolo,* supra, 324 Pa.Super. 61, 471 A.2d 462.

■ The defense found at Section 510, though, is based on the tort principle of privilege and it does involve proof of imminence.

See *Restatement of Torts Second* § 196 which states: One is privileged to enter land in the possession of another if it is, or if the actor reasonably believes it to be necessary for the purpose of averting an imminent public disaster.

In this respect Section 510 would seem to impose a stricter standard than § 503, since as to Section 503, imminence is not a controlling factor. See *Commonwealth v. Capitolo,* supra, 324 Pa.Superior Ct. 61, 471 A.2d 462, in which we note that the Section 510 requirement that imminence be proved differs somewhat from the role of imminence in the general justification defense found at § 503. See discussion of § 503, *supra.*

7. *See* American Law Institute, *Model Penal Code* § 3.02, Commentary at 5–7 (Tent.Draft No. 8, 1958).

It seems beyond debate that use of nuclear weapons would cause a public disaster within the meaning of *Restatement of Torts Second* § 196 and, therefore, within the terms of § 510. In fact the trial court readily conceded that the horrors of nuclear war are well documented.

Having established that element of the defense, it was left to appellants to show that they reasonably believed their actions to be necessary for the purpose of averting an imminent disaster. Without evidence to show the imminence of the disaster or the causal relationship between the action and the averting of the harm, appellants could not meet their burden of proof. See *Commonwealth v. Capitolo*, 324 Pa.Super. 61, 471 A2d 462 (1984), in which we explained:

> By limiting appellants' evidence to their own testimony of their reasons for committing the trespass, the trial court—as it recognized it was doing—effectively denied appellants the opportunity to prove justification. For as already discussed, it was not enough for appellants to prove that they *believed* that "the harm or evil sought to be avoided [by their conduct] [was] greater than that sought to be prevented by the law defining [their conduct as criminal trespass]." 18 Pa.C.S.A. § 503(a)(1). They had to prove that they *reasonably* so believed. And they could not prove their reasonableness without proving what in fact "the harm or evil sought to be avoided" *was*. A defendant may *believe* that a nuclear reactor is likely to melt down and cause a catastrophic accident, or that radiation leakages are causing cancer and poisoning the reservoir. But without any *basis in fact* these beliefs cannot be *reasonable*. By rejecting appellants' offer of the expert testimony and documentary evidence summarized in their offer of proof, the trial court precluded appellants from proving that their beliefs did have a basis in fact. Thus the court precluded appellants from proving that their beliefs were reasonable.

Similarly, by limiting appellants' evidence to their own testimony, the trial court made it impossible for them to

establish a basis in fact for the belief that the weapons components posed an imminent threat of harm. Appellants in the instant case, like those in *Capitolo,* supra, were precluded from proving the reasonableness of their beliefs.

At trial, appellants, who represented themselves with the assistance of advisory counsel, sought to prove that each of them had acted with justification. In order to establish the defense, appellants were required by Sections 503 and 510 to prove that it was *reasonable* for them to believe that their actions were necessary to avoid a greater harm. Appellants tried to introduce expert evidence in order to prove the elements of the defense. It is this evidence which the lower court would not allow.

When appellants attempted to introduce the first of several planned expert witnesses, they were told by the court that the witness would not be permitted to testify.

That first witness was Robert Aldridge. When the prosecutor objected to his testifying and asked for an offer of proof appellant Sister Anne Montgomery said, "We wish to call him as a witness to present facts relevant to our case, since he can speak to the significance and really what this exhibit is, . . . ."

After Mr. Aldridge's qualifications as a weapons expert were explained, the court ruled that he could not testify because his testimony would be irrelevant to the facts at issue. The court did say that Aldridge could present reputation evidence, but that, of course, was not the appellants' purpose in calling him. The court explained: "I think the proper way to prove your intent is for you to testify as to what you did and what you saw, the justification yourself from the stand."

The court said that expert testimony as to the horrors of nuclear war would "bolster" appellants' argument, which testimony could come from them. The judge continued, "And I have ruled and will *continue to rule,* anything they say about justification, they can say as to themselves."

In response to counsel's suggestion that expert witnesses would show a reasonable basis for what appellants believe the court opined, "But that isn't the issue," The court concluded, "and it is clear to me that the testimony proffered *or to be* proffered is not relevant to the issue at hand." Later in the trial the court explained its previous ruling saying, "The ruling was there would be no expert testimony with respect to the views of these experts, because opinion testimony, first of all, is not relevant to those issues, because for every opinion that you have as to one point of view, you will have an opinion opposing that."

Both the general justification defense found at 18 Pa.C.S. § 503 and that at 18 Pa.C.S. § 510 require that the belief of the actor that his action is necessary be a reasonable belief. See 18 Pa.C.S. § 501, *supra.* How can a defendant show the reasonableness of his position without reference to the basis or reason for it? Surely some evidence explaining what it was that appellants believed and why they believed it, was necessary to meet the "reasonableness" standard of the defense.

Similarly, how can appellants show that it was reasonable to believe that the harm they sought to avoid was imminent without reference to evidence of imminence?

We wish to emphasize that we do not hold that appellants should have been able to introduce any witnesses they desired, without regard to the proffered testimony. Of course, the testimony must be relevant. Furthermore, at the conclusion of the case, the lower court might properly determine that insufficient evidence was presented to sustain the justification defense. If the proffer indicates that even if the testimony were believed, it would not satisfy the requirements of the justification defense, then the lower court might also preclude the testimony. In this case, however, the record before us is devoid of evidence that the proffered testimony was irrelevant.

The transcript indicates that the appellants presented to the court a brief entitled Points and Authorities in Support of Evidentiary Proffer but that brief was not made a part

of the record. No other written offer of proof is contained in the record and, as we have indicated, the appellants were precluded from presenting an oral offer as to any expert witness, other than Mr. Aldridge. In fact, when appellants asked the trial court for permission to put on the record the names of those expert witnesses whom they had intended to call, he permitted them to include only the name of Mr. Aldridge.[8]

We believe that the lower court improperly limited evidence which appellants sought to introduce in support of the justification defense.

■ It is well established that: "An accused has a fundamental right to present defensive evidence so long as such evidence is relevant and not excluded by an established evidentiary rule." *Commonwealth v. Greene*, 469 Pa. 399, 405, 366 A.2d 234, 237 (1976). *See also: Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *Commonwealth v. Boyle*, 470 Pa. 343, 368 A.2d 661 (1977); *Commonwealth v. Cropper*, 463 Pa. 529, 345 A.2d 645 (1975); *Commonwealth v. Bailey*, 450 Pa. 201, 299 A.2d 298 (1973); *Commonwealth v. Collins*, 447 Pa. 300, 290 A.2d 121 (1972); *Commonwealth v. Boone*, 287 Pa.Super. 1, 429 A.2d 689 (1981). Thus, if a defendant poses a defense of justification under § 503, in a setting where it is lawfully available, he must be accorded, to the extent that our evidentiary rules allow, the right to present all relevant evidence which he chooses concerning that defense. *Commonwealth v. Walley*, 466 Pa. 363, 353 A.2d 396 (1976).

■ Clearly, the issue of justification in this Commonwealth, when properly raised, is a factual one which must be resolved by the fact finder. *Cf: Commonwealth v. Schaller*, 493 Pa. 426, 426 A.2d 1090 (1981); *Commonwealth v. Brown*, 491 Pa. 507, 421 A.2d 660 (1980); *Commonwealth v. McGuire*, 487 Pa. 208, 209, 409 A.2d 313

8. In her opening address Molly Rush said they would present expert witnesses who would testify regarding the kind of harm or evil sought to be avoided and "who will give you information about the immediacy of the threat of nuclear war and the effect of nuclear war."

(1979); *Commonwealth v. Colbert*, 476 Pa. 531, 383 A.2d 490 (1978). Accordingly, the fact finder decides both whether the defendant's subjective justificatory beliefs were honest and sincere and whether acting upon such a belief was objectively reasonable. *Commonwealth v. Schaller*, supra. In this process, as we have noted, the fact finder may consider, in gauging the genuineness of this belief, whether reasonable legal alternatives to breaking the law existed or, if the circumstances of the case warrant such a finding, that the threat posed was sufficiently imminent to justify such an act.

■ The lower court erred when it ruled that appellants could not introduce the evidence they needed to show the objective reasonableness of their actions. Instead, the court limited their proof to showing the subjective reasonableness of the action.

■ Similarly, while we agree with the dissent's conclusion that the record does not contain evidence that the harm was imminent, we conclude that the appellants were effectively and improperly precluded from presenting evidence to show imminence, as required by § 510.

We turn next to the dissent's conclusion, stated without explanation, that it is unreasonable as a matter of law to believe that nuclear disaster could be avoided by the actions undertaken by appellants.

■ Unlike the dissent which seems to say that to avail themselves of the defense appellants must be able to show that their actions could totally avert nuclear war, we will not hold them to such a burden. Appellants must show that their actions could reasonably have been thought necessary to avert a public disaster. See Restatement, § 196, supra. Surely the use of the weapons, the components of which were damaged by appellants would cause a public disaster on the order of a "conflagration, flood, earthquake or pestilence." See *Capitolo*, supra.

Appellants explain in their brief that Robert Aldridge would have described the nature of the weapons compo-

nents at the G.E. plant and shown that the hydrogen bombs for which they were being constructed could not operate without them. Therefore, the argument might reasonably be made that destruction of those components could avert nuclear disaster to an appreciable extent.

■ While appellants surely had as their ultimate goal the destruction of all nuclear weapons, we will not find their defense unreasonable simply because their action could immediately result in damage to only some of those weapons, since destruction of those weapons alone might reasonably avert disaster.

■ Nor do we agree with the dissent's conclusion that the justification defense was unavailable to appellants because there exists a legislative purpose to exclude it.

As the dissent notes, both 18 Pa.C.S.A. § 503 and § 510 provide that the defenses are available if a "legislative purpose to exclude the justification does not otherwise plainly appear." The dissent finds such a purpose in the provisions of the Atomic Energy Act of 1954, 42 U.S.C. § 2011 et seq. and 18 U.S.C. § 2155, which makes the destruction of nuclear defense materials a crime.

We have reviewed the provisions of these statutes and do not see in them evidence of a purpose to exclude the justification defense.[9]

True, 18 U.S.C. § 2155 may conceivably make criminal the activities engaged in by appellants, but how does the existence of another crime with which they might have been charged affect the availability of the justification defense to the crimes before us? Appellants may even have been chargeable with other, unmentioned crimes, but we are not aware of a principle that states that the defenses available to a defendant are limited by the numbers of crimes with

9. We are cognizant of the fact that, as the dissent notes, the courts of other jurisdictions have held otherwise. However, the decisions of those courts are not binding upon us and we consider them to be in error.

which he might be charged. Yet in citing 18 U.S.C. § 2155, that is the principle espoused by the dissent.

While the Atomic Energy Act does contain a declaration of policy favoring "the development, use and control of atomic energy ... so as to make the maximum contribution to the general welfare," *Id.* at § 2011, we note that neither that Act nor the Energy Reorganization Act, 42 U.S.C. §§ 5801–5891 also mentioned by the dissent, contains a statement of "clear and manifest purpose" to exclude the justification defense to a charge of burglary in Pennsylvania. See *Capitolo,* supra, 324 Pa.Super. 61, 471 A.2d 462, in which this Court so finds no such purpose.

In this regard see also *Silkwood v. Kerr-McGee Corporation,* — U.S. —, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), in which the United States Supreme Court has recently held that a state-authorized award of punitive damages arising from a federally licensed nuclear facility is not preempted by the Atomic Energy Act, nor by the proscription against states regulating the safety aspects of nuclear energy.

While we as a nation, through our Congress, have enacted legislation indicating that we favor the use of nuclear power for the general welfare, we as residents of the Commonwealth of Pennsylvania have enacted a Crimes Code containing a justification defense that relieves from criminal liability those persons who act with a reasonable belief that their actions are necessary to avert imminent disaster. It is the criminal liability of appellants that is at issue, not the merits of our nuclear policy. The jury need not agree with appellants' views in order to acquit them. They need to find only that they acted reasonably.

 As the Model Penal Code draftsmen of this provision specified, such a plain legislative purpose to exclude must be "a deliberate legislative choice, as when the law has dealt *explicitly* with the specific situation that presents the choice of evils ..." American Law Institute, *Model Penal Code,* § 3.02, Commentary at 6 (Tent. Draft No. 8,

1958) (emphasis added). A legislative choice is plain and explicit where "the legislature has itself canvassed and determined what the choice [of evils] shall be." *Id.* No such plain nor explicit legislative choice to exclude appellants' proffered justifications appears in this case and it is not the province of the judiciary to imply or create such an exception, however inappropriate we may personally feel appellants' conduct to have been.[10]

## II.

Appellants further contend that the trial judge erred in the conduct of voir dire in various respects. Most significantly, they argue: (1) that each potential juror should have been interviewed outside the presence of the other panel members; (2) that the lower court improperly excluded the public from the jury selection process.

The scope of voir dire rests in the sound discretion of the trial judge and his decision will not be reversed in the absence of palpable error. *Commonwealth v. Sparrow*, 471 Pa. 490, 370 A.2d 712 (1977); *Commonwealth v. Fulton*, 271 Pa.Super. 430, 413 A.2d 742 (1979); *Commonwealth v. Stanton*, 269 Pa.Super. 305, 409 A.2d 901 (1979). The exercise of this discretion is, however, subject to the basic demands of fairness. *Bentivoglio v. Ralston*, 447 Pa. 24, 288 A.2d 745 (1972). *Commonwealth v. Davis*, 282 Pa.Super. 51, 422 A.2d 671 (1981).

The Pennsylvania Supreme Court said in *Commonwealth v. England*, 474 Pa. 1, 6–7, 375 A.2d 1292, 1295 (1977):

**10.** We note finally the dissent's intimation that appellants' actions should be treated as civil disobedience, with appellants accepting the punishment due them for the commission of the crime. This position, however, ignores the fact that appellants claim not to have committed the crime; or in the alternative to have been justified in committing it. They do not claim, as those who commit civil disobedience do, to have broken the law. Therefore, civil disobedience principles are not applicable to this case. See *Capitolo*, supra, for a thorough discussion of the distinction between civil disobedience and justification.

The single goal in permitting the questioning of prospective jurors is to provide the accused with a "competent, fair, impartial and unprejudiced jury." ...

Although latitude should be permitted on a voir dire, the inquiry should be strictly confined to disclosing qualifications or lack of qualifications and whether or not the juror had formed a fixed opinion in the case as to the accused's guilt or innocence.

*See also Commonwealth v. Davis, supra,* 282 Pa.Super. at 54, 422 A.2d at 672.

The Supreme Court in *Commonwealth v. England, supra,* 474 Pa. at 8, 375 A.2d at 1296, further admonished our courts stating:

A prospective juror's personal views are of no moment absent a showing that these opinions are so deeply embedded as to render that person incapable of accepting and applying the law as given by the court. So long as the juror is able to, intends to, and eventually does, adhere to the instructions on the law as propounded by the trial court, he or she is capable of performing the juror's function. In this regard, it may safely be inferred that a juror will not violate his or her oath in the absence of any expression or other indications to the contrary.

*See also Commonwealth v. Sparrow, supra; Commonwealth v. Dukes,* 460 Pa. 180, 331 A.2d 478 (1975); *Commonwealth v. Dolhancryk,* 273 Pa.Super. 217, 417 A.2d 246 (1979).

In essence, as our Supreme Court explained in *Commonwealth v. Crowder,* 444 Pa. 489, 282 A.2d 361 (1971): "The voir dire examination is merely a means to the end of achieving an impartial jury."

Voir dire began on February 23, 1981 and concluded on March 2, 1981. On February 23, the jury panel of 40 persons was interviewed as a group. Each of the appellants questioned the prospective jurors. When approximately 15 of the panel members indicated that they were biased against the defendants due to pretrial publicity, the entire panel was excused. On February 24, prospective

jurors were interviewed in panels of four. Again, each of the appellants was permitted to question panel members.

On February 25, the prospective jurors were interviewed in panels of four, but on this date the questions were posed by the court. The appellants were only permitted to supplement those questions asked by the court by submitting to the judge proposed written questions. The questions were not preserved for our review. *See* Rule 1106(d), *Pennsylvania Rules of Criminal Procedure.*

Pennsylvania Rule 1106 provides that in non-capital cases, the trial judge is to conduct voir dire by either individual voir dire or a list system of challenges. Appellants argue that because of the extensive pre-trial publicity about their case, the trial judge ought to have conducted individual voir dire.

In *Commonwealth v. Johnson,* 440 Pa. 342, 269 A.2d 752 (1970) the Supreme Court found that much of the publicity preceding Johnson's trial had been prejudicial. The media accounts included coverage of inflammatory statements by the District Attorney. The case was a racially sensitive one. Under these circumstances, the court found that the trial court had abused its discretion in refusing to conduct individual voir dire. It reasoned:

> If the action of the trial court in arbitrarily refusing to allow voir dire out of the hearing of other jurors were upheld, it would have the effect of writing into the rule a provision that a trial judge need not take an easy precaution which might prevent a trial from being prejudiced by pretrial publicity if he doesn't want to. When there is present in a case inflammatory pretrial publicity which creates the possibility that a trial could be prejudiced, there are exactly those circumstances present which require each juror to be questioned out of the hearing of the other jurors. Consequently, in such situations, when this form of voir dire is requested, it is an abuse of discretion to refuse that request.

440 Pa. at 351–353, 269 A.2d at 757.[11]

It is undisputed that the present case has been accompanied by an extraordinary amount of publicity. The trial judge himself noted during voir dire that "everybody around here [has formed an opinion] because they read about [the case] in the newspapers."

In *Commonwealth v. Johnson, supra,* all of the jurors who indicated that they had read or heard of the appellant indicated that despite such awareness of him, they were of an open mind. The Supreme Court, nevertheless, found that individual voir dire outside the hearing of other jurors would have been preferable because each prospective juror needed to be examined "as to the exact amount of publicity concerning the appellant he had experienced, and which information he had retained and in this manner possible challenges for cause might have developed." 440 Pa. at 352, 269 A.2d at 757. *Compare, Commonwealth v. Dolhancryk, supra.*

In this case, all but two of sixty prospective jurors responded that they had heard of the incident which gave rise to the charges for which appellants were being tried. Most of the jurors also said that they would still be able to judge appellants fairly based on the evidence presented at trial. Nonetheless, we conclude that *Commonwealth v. Johnson, supra,* is controlling, that the widespread publicity surrounding this case and its potential to arouse prejudices required that potential jurors be interviewed individually.[12] Thus, at the new trial the individual voir dire and challenge system outlined in Rule 1106(e)(1) must be followed.

**11.** Although the decision in *Commonwealth v. Johnson, supra,* predates our present Rule 1106, it has been cited since the adoption of that rule for the principle that each prospective juror should be questioned out of the hearing of other prospective jurors where such a procedure will help to assure a fair trial. *See Commonwealth v. Smith,* 480 Pa. 524, 391 A.2d 1009 (1978).

**12.** It is of course advisable that any juror dismissed for cause also be segregated entirely from other selected or prospective jurors.

■ The court on remand must also strictly comply with Rules 1108 and 1126, *Pennsylvania Rules of Criminal Procedure,* regarding the number of peremptory challenges to which the Commonwealth and each defendant are entitled.

■ Furthermore, the appellants contend that they, rather than the judge, should have been permitted to question prospective jurors. In this case, the effect of such a procedure may well have been to subject jurors to questioning by many individuals. This process could have been unduly lengthy and unwieldy. The format of the voir dire, in this regard, must remain in the sound discretion of the trial judge. *Cf. Commonwealth v. Africa,* 466 Pa. 603, 353 A.2d 855 (1976). However, on remand, should the trial judge in his discretion, decide to question the jurors himself, he must, of course, permit the appellants to submit proposed questions for the jurors to him. These questions shall be retained to become part of the record. *See,* Rule 1106(c). We also direct that a record of the strike off sheet be kept and preserved for appellate review.

Appellants also contend that the voir dire of prospective trial jurors was improperly closed to the public. The trial judge limited access to the parties and the press.[13]

The United States Supreme Court decided recently the voir dire process must be open to the public, absent specific findings by the trial court that a public voir dire would violate the privacy interests of the prospective jurors. In *Press-Enterprise Company v. Superior Court of California, Riverside County,* —— U.S. ——, ——, 104 S.Ct. 819, 826, 78 L.Ed.2d 629 (1984), the Court instructed:

Where ... the state attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest.... The presumption of

**13.** This issue was preserved for review in accordance with our Supreme Court's holding in *Commonwealth v. Mimms,* 477 Pa. 553, 556–557 n. 5, 385 A.2d 334, 335 n. 5 (1978).

openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.

While the *Press-Enterprise* case involved a First Amendment claim by the press, rather than a claim by the defendant that his right to public trial had been violated, (as is presented to us), we nonetheless find the opinion helpful to the disposition of the case before us. As the Court noted *Id.* at ——, 104 S.Ct. at 825

For present purposes, how we allocate the "right" to openness as between the accused and the public, or whether we view it as a component inherent in the system benefiting both, is not crucial.

. . . The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed: the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known.

The Pennsylvania Constitution provides at Article 1 § 9: "In all criminal prosecutions [by indictment or information] the accused hath a right to . . . a . . . public trial . . . ." Const. Art. 1 § 9. Article 1, Section 11 provides that "[a]ll courts shall be open."

This court recently held that the right to a public trial, under both the United States Constitution and the Pennsylvania Constitution, includes the right to have a jury selected in public. *Commonwealth v. Johnson*, 309 Pa.Super. 367, 455 A.2d 654 (1982). In a comprehensive opinion in that case Judge Spaeth said,

The guarantee of a public trial in a criminal case is not for the protection of only the accused. The victim, in particular, and the community, in general, are also within the guarantee. "[I]f people care to use the courts, they must trust them. Courts achieve this goal by allowing

people to observe, study, and compare them with other methods of rendering disputes." (Citations omitted.) *Id.*, 309 Pa.Superior Ct. at 376, 455 A.2d at 658.

After concluding that the right to public trial extends to the jury selection process, the *Johnson* opinion acknowledges that the right to a public trial is not absolute, but, rather, must be considered in relationship to other important matters. That is, the record should be examined to determine whether it discloses any interest, or reason, sufficient to support the lower court's limitation of the appellants' right to a public trial. *Id.*, 309 Pa.Superior Ct. at 383, 455 A.2d at 662. *See also Commonwealth v. Knight*, 469 Pa. 57, 364 A.2d 902 (1976).

We explained in *Commonwealth v. Johnson, supra* that the propriety of a limitation on the right to a public trial must be tested by the standard of "strict and inescapable necessity." *Id.*, 309 Pa.Superior Ct. at 383, 455 A.2d at 662. See also *Press-Enterprise Company, supra.*

 Our review of the record discloses there was no necessity for the court to have been closed during appellants' voir dire.

The trial judge explained that he ordered the closure in order to prevent noise and confusion. It seems obvious to us that courtroom decorum can be maintained without invoking such drastic measures; certainly, there has been displayed no strict and manifest necessity for the closing of the court. As the Supreme Court observed in *Press-Enterprise Company, supra,* —— U.S. at ——, 104 S.Ct. at 823, "[S]ince the development of trial by jury, the process of selection of jurors has presumptively been a public process with exceptions only for good cause shown." No such good cause was demonstrated in the instant case.

## III.

Appellants argue that the trial judge should have recused himself. We need not discuss the judge's failure to recuse himself at the first trial, since we have determined that

appellants are otherwise entitled to a new trial. We agree, however, that the new trial should not be conducted by the same judge, nor should he be involved in any further proceedings in this case.

The record in this case is replete with emotionally charged exchanges between the court and appellants and their advisory counsel.

For example, after appellants asked advisory counsel to no longer represent their interests at trial, counsel left the courtroom while some of the defendants stood with their backs to the Court.

The court then instructed the jury and called a recess. Following the recess, advisory counsel returned. The court informed counsel that he considered their behavior in leaving the courtroom to be a direct act of contempt. The discussion that followed contained the following exchanges:

THE COURT: Let me say something else. You have an obligation to this Court, as does every single attorney who appears here, to properly conduct yourself with proper demeanor.

MR. SHIELDS: Our first obligation is to our clients. I think we carried that out.

MR. GLACKIN: I think under the conditions in this courtroom we performed like saints.

THE COURT: I am sure you performed like saints. You performed like saints to the press yesterday, too.

MR. GLACKIN: That has nothing to do with this courtroom, Your Honor. If you have any comments about that, you can reserve that for some cocktail lounge.

THE COURT: I have no personal grudge about that.

MR. GLACKIN: It's odd that it should come out now.

THE COURT: It's odd that it came out in the paper.

MR. GLACKIN: Well, isn't that too bad, that the truth shall be heard? And the truth doesn't make everybody—

\*　　\*　　\*　　\*　　\*　　\*

MR. GLACKIN: You are not going to taint my reputation with impunity, I will tell you that.

THE COURT: You are not going to make a threat to the Court either.

MR. GLACKIN: Why don't you sue for blasphemy? In a sense, it is a badge of honor.

While the question of whether counsel behaved contemptuously is not before us, we cite the above quoted instance as an example of the heated emotional dialogue that occurred at various points during the trial.

While we did not cite other instances at length we note that at one point one of the defendants, Molly Rush, accused the court of having lied to the defendants and said "... Your Honor, we believe the Court, and you personally, have displayed yourself, I think, along with the entire judicial system of this country as the legalized arm for genocide."

In *Mayberry v. Pennsylvania*, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), the United States Supreme Court held that by reason of the Due Process clause of the Fourteenth Amendment, a defendant in criminal contempt proceedings should be given a public trial before a judge other than the one reviled by the contemnor.

As we have indicated, contempt proceedings are not before us for review and in this regard our case differs from *Mayberry* in which the trial court's finding of the defendants in contempt at the conclusion of trial was before the Supreme Court. We nonetheless find the *Mayberry* opinion instructive.

In *Mayberry* the trial court did not act at the time the contempt was committed, but waited until the end of trial. The Supreme Court observed that it is "generally wise where the marks of the unseemly conduct have left personal stings to ask a fellow judge to take his place." *Id.* at 464, 91 S.Ct. at 504.

As the Court explained,

Whether the trial be federal or state, the concern of due process is with the fair administration of justice. At times a judge has not been the image of "the impersonal

authority of law" (*Offutt v. United States*, 348 U.S. 11, 17, 75 S.Ct. 11, 15, 99 L.Ed. 11) but has become so "personally embroiled" with a lawyer in the trial as to make the judge unfit to sit in judgment on the contempt charge.

*Id.* at 465, 91 S.Ct. at 504, 505.

■■■ We conclude similarly that the trial judge in the instant case became so "personally embroiled" with both the lawyers and the defendants in this case as to require him to recuse himself from further participation in the case.

We note additionally that the Code of Judicial Conduct, adopted by the Supreme Court of Pennsylvania, effective January 1, 1974, 455 Pa. at XXXIX (1973), Canon 3 A (6) states: "A judge should abstain from public comment about a pending proceeding in any court....". Despite this proscription, the trial judge apparently granted an interview to the *New York Times* during the voir dire period and was quoted as having said, "It's a different kind of case. In any case of civil disobedience, the prosecutor, the judge and the jury are put on trial."

■■■ The trial judge should not have commented upon what he perceived to be appellant's trial strategy. His comments certainly indicated to the public the way in which he viewed appellants' position although the trial had barely begun.

See Code of Judicial Conduct Canons 2 and 3(C). See also *Commonwealth v. Darush*, 501 Pa. 15, 459 A.2d 727 (1983) in which our Supreme Court considered as relevant to a recusal motion remarks by the trial judge from which a significant minority of the lay community could reasonably question the court's impartiality.

In addition to his public comment the trial judge made known his sentiments about the case in a letter sent by him to a filmmaker who had requested permission to film the courtroom, a copy of which was made an exhibit to appellants' recusal motion. The judge wrote: "I feel that to make a documentary of such an insignificant situation will

make heroes of immature and intransigent people, enhancing their status and importance. It gives them the much wanted publicity which motivated them to do the illogical act in the first place."

The Supreme Court explained in *Commonwealth v. Boyle*, 498 Pa. 486, 490 n. 4, 447 A.2d 250, 252 n. 4 (1982) that:

A jurist's impartiality is called into question whenever he has doubts as to his ability to preside objectively and fairly in the proceedings or where there exists [sic] factors or circumstances that may reasonably question the jurist's impartiality in the manner.

We certainly recognize that the trial judge was under great pressure in this case. We do not condone the defiant, disrespectful behavior of appellants and advisory counsel. Nevertheless, the fact remains that the judge was not only attacked on a personal level, as was the judge in *Mayberry, supra,* he also responded to the appellants in such a way as to display his partiality.

The new trial is therefore to be conducted by a judge other than the judge who presided over the first trial.

## IV.

Next, the appellants assert that the informations filed against them were not properly signed. The informations were not signed by the District Attorney, but, rather, by Assistant District Attorney John Armstrong. The informations were executed on October 23, 1980. On March 10, 1980, Assistant District Attorney Armstrong had been designated by the District Attorney as an assistant authorized to sign criminal informations. See 42 Pa.C.S. § 8931(d)(e) [14] which discusses the duties of prosecuting attorneys as to indictment and information and 42 Pa.C.S. § 8931(i) which provides for the written designation procedure followed in this case. See also Pa.R.Crim.P. 225(b) which requires that a criminal information be signed by the attorney for the

14. Act of July 9, 1976, P.L. 586, No. 142; as amended.

Commonwealth. For a comprehensive discussion of the signature requirement see our Supreme Court's recent opinion in *Commonwealth v. Emanuel*, 501 Pa. 581, 462 A.2d 653 (1983).

Subsequent to March 10, 1980, when Mr. Armstrong was designated as authorized to sign informations, other lists of designated assistant district attorneys were filed by the District Attorney of Montgomery County. Appellants contend that because Mr. Armstrong was not again named as a designee, his designation had been withdrawn by the District Attorney. We agree with the lower court's conclusion that the addition of names did not itself revoke the authority previously given to Mr. Armstrong. The informations were therefore signed in conformance with 42 Pa.C.S. § 8931.

Having concluded that appellants are entitled to a new trial, we reverse judgments of sentence and remand for new trial at which appellants shall be permitted to prove, if they can, that their conduct was justified.

SPAETH, J., files a concurring opinion.

WIEAND, J., files a concurring and dissenting opinion in which HESTER and JOHNSON, JJ., join.

SPAETH, Justice, concurring:

I join Judge BROSKY's opinion, and offer the following comments in the hope that it may be helpful to approach this case, which has given us such difficulty, from a somewhat different angle.

1

The justification defense arose from the recognition that literally interpreted, the law may be not merely "a ass," caught up in its arcane technicalities, but cruel. A lost and starving man who breaks into a cabin and eats food he finds there is *not* a burglar and thief. *Cf.* American Law Institute, Model Penal Code § 3.02 Comment at 9 (Tent. Draft No. 8, 1958) (citing examples). There are "higher value[s] than the value of literal compliance with the law." G.

Williams, The Criminal Law § 229 (2d ed. 1970). As soon as we acknowledge this fact, we recognize that the justification defense is "essential to the rationality and justice of all penal provisions." Model Penal Code, *supra*, § 3.02 Comment at 5.

Accordingly, whenever a defendant pleads justification, the court should ask, "What value higher than the value of literal compliance with the law is defendant asserting?" The trial court failed to ask this question. Apparently in its eyes *no* higher value is implicated in this case. And for the dissent, this case is to be decided as we would decide a case involving "the theft and destruction of guns or explosives by altruistic and well-meaning citizens who sincerely believe that guns or explosives possess the potential to kill at sometime in the future." Dissenting op. at 285–288. But appellants are not pleading as their justification the danger arising from "guns or explosives;" they are pleading the danger arising from nuclear missiles. One who does not understand that danger does not understand appellants' plea.

The trial court says that appellants "failed to establish the urgency or 'imminent danger' of the public disaster which [they] sought to prevent." Slip op. at 29. But, I submit, a "public disaster" *is* "imminent." "Imminent" means "[t]hreatening to occur immediately; near at hand; impending;—said esp. of misfortune or peril." Webster's New International Dictionary 1245 (2d ed. 1938). By resorting only to our own Government's official publications, we may learn that the United States and the Soviet Union— without reference to Great Britain and France (and others? Israel?)—each has the capability of destroying the other within minutes and on command. *See e.g.*, The Effects of Nuclear War, Office of Technology Assessment (1979) (describing effects of nuclear attacks in various proportions); The Effects of Nuclear Weapons, Department of Defense and Energy Research and Development Administration (1977) (same). Why, then, is disaster not "imminent"? Because our Government and its allies would never initiate

the attack? Because the Soviet Union is afraid to initiate it, knowing what our response would be? If this *is* the trial court's reasoning—we don't know, for the court doesn't state its reasoning—one can only say that many find it unpersuasive. Among the many are the Bishops of the Catholic Church, who say in their *"Pastoral Letter on War and Peace, The Challenge of Peace: God's Promise and Our Response,"* Publ. No. 863, U.S. Catholic Conf. at 40 (1983):

> We live today, therefore, in the midst of a cosmic drama; we possess a power which should never be. used but which might be used if we do not reverse our direction. We live with nuclear weapons knowing we cannot afford to make one serious mistake.

Also among the many are the authors of the *Bulletin of Atomic Scientists*, whose symbol for the imminence of nuclear war is a clock. In the January 1984 edition of the *Bulletin*, the clock stands at three minutes to midnight (in the December 1983 edition, it stood at four).

The dissent, like the trial court, says that "it was unreasonable as a matter of law [for appellants] to believe that nuclear war could be avoided merely by destroying one of several components being separately made for incorporation into *future* nuclear missiles." Dissenting op. at 1121. (emphasis in original). *See* Trial Court Slip op. at 29–30. But nothing in the record warrants the conclusion that this *was* appellants' belief. Appellants do not assert that their action would *avoid* nuclear war (what a grandiose and unlikely idea!). Instead, at least so far as I can tell from the record, their belief was that their action, *in combination with* the actions of others, *might accelerate a political process* ultimately leading to the abandonment of nuclear missiles. And *that* belief, I submit, should not be dismissed as "unreasonable as a matter of law." A jury might—or might not—find it unreasonable as a matter of *fact*. But that is for a jury to say, not for a court.

The fallacy in the trial court's and the dissent's reasoning is to equate "reasonableness" with "success": if by break-

ing the law you did not succeed in gaining your objective, you may not plead justification. But reasonableness is a function of the actor's situation. If the peril to the town was slight, it may indeed have been unreasonable of me to make a firebreak by destroying my neighbor's house. But if the peril was great, my action may be seen in a very different light, and my plea of justification may prevail, even in the face of proof that the fire swept across the space I had cleared, and burned down the town. *See, e.g., State v. Wooten,* Crim. No. 2685 (Cochise Cty., Ariz. Sept. 13, 1919) (unreported) reprinted in Comment, The Law of Necessity and the Bisbee Deportation Case, 3 Ariz.L.Rev. 264 at 278 (1961) ("One claiming the right to destroy buildings to prevent the spread of a conflagration must necessarily have that right determined by the condition existing or appearing to a reasonable man to exist at the time of the destruction."). *See generally* Arnolds & Garland, The Defense of Necessity in Criminal Law: The Right to Choose the Lesser Evil, 65 J.Crim.L. & Criminology 289 (1974).[1]

No peril is greater—no peril even approaches—the peril of nuclear war:

The people in the Pentagon offices and their counterparts in the Kremlin where the questions of coping with war injuries are dealt with must be having a hard time of it these days, looking ahead as they must to the possibility of thermonuclear war. Any sensible analyst in such an office would be tempted to scratch off all the expense items related to surgical care of the irradiated, burned, and blasted, the men, women, and children with empty bone marrows and vaporized skin. What conceivable benefit can come from sinking money in hospitals subject to instant combustion, only capable of salvaging, at their intact best, a few hundred of the victims who will be lying out there in the hundreds of thousands? There exists no

---

**1.** I know that other courts have used the same reasoning that the dissent has. *See, e.g., United States v. Best,* 476 F.Supp. 34 (D.Colo. 1979); *State v. Marley,* 54 Haw. 450, 509 P.2d 1095 (1973). *But see Commonwealth v. Capitolo,* 324 Pa.Super. 61, 78–80, 471 A.2d 462, 471 (1984) discussing in some detail why this reasoning is unpersuasive).

medical technology that can cope with the certain out-come of just one small, neat, so-called tactical bomb exploded over a battlefield. As for the problem raised by a single large bomb, say a twenty-megaton missle (equiv-alent to approximately two thousand Hiroshimas) dropped on New York City or Moscow, with the dead and dying in the millions, what would medical technology be good for? As the saying goes, forget it. Think of something else. Get a computer running somewhere in a cave, to estimate the likely numbers of the lucky dead. L. Thomas, *On Medicine and the Bomb,* reprinted in L. Thomas, Late Night Thoughts on Listening to Mahler's Ninth Sympho-ny at 118 1983).

Nor is the peril confined to those who will be "irradiated, burned, and blasted." It extends much farther, to our survival as a species. If only a small fraction of the nuclear missiles now able to be fired, either by us or the Soviet Union, are fired, a "dark nuclear winter" will occur: a cloud of debris will block off our sunlight; temperatures will plunge; and our death by freezing or starvation will follow. Scientists have identified a 100 megaton explosion as the "nuclear war threshold" that once crossed will lead to such a global catastrophe. *See* "After Atomic War: Doom in the Dark," Phila. Inquirer, November 1, 1983, at 1. It is in the light of this peril that the reasonableness of appellants' belief must be judged.

Perhaps a jury will discount evidence that our situation is as desperate as the authorities I have alluded to believe. Or perhaps a jury will regard appellants' conduct as mere bravado. On either of these views, appellants' plea of justification will fail. But we must leave such appraisals to a jury. For we are not entitled to hold, "as a matter of law," as the dissent would, that a jury could not find that our situation is as desperate as appellants offered to prove, and then, proceeding from that finding, could not go on to decide that appellants' conduct, however unlikely of suc-cess, represented a reasonable response. I admit that for my part—and here at least I suppose that the dissenters

and I are not far apart—I am skeptical of appellants' conduct. I believe there are better ways, the Bishops' among them. But that is what trial by jury is all about: to ensure that the defendant is not judged by a skeptical judge but by his peers.

2

Like Judge BROSKY, I find nothing in support of the claim that Congress, in exercising the war power, has preempted the defense of justification, and I see no need to add to the discussion of preemption in *Commonwealth v. Capitolo*, 324 Pa.Super. 61, 471 A.2d 462 (1984), except for a brief comment on the dissent's reliance on *Hirabayashi v. United States*, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943), and Senate Report No. 1699.

In *Hirabayashi* the Court upheld an Executive Order of the President confining some 70,000 American citizens to designated military zones because they were Japanese or of Japanese ancestry. It is not one of the Court's finer moments,[2] and to the extent that it still stands for anything, it illustrates how an uncritical acceptance of the war power can lead us to abandon liberties we say we hold dear.

The dissent cites Senate Report No. 1699, U.S.Code Cong. & Admin.News 1954, p. 3456, which discusses the Atomic Energy Act of 1954, as showing that Congress was "fully cognizant of the dangers inherent in nuclear weapons." Dissenting op. at 289. But no one today shares the Report's serene confidence in "our atomic weapons stockpile." If the Report shows anything, it shows that Congress was *not* fully cognizant of the dangers inherent in nuclear weapons. If we are inquiring into Congressional cognizance, we should do better to examine the debates over whether to authorize the production of the MX missile, *see, e.g.,* 129 Cong.Rec.H. 5309–50 (daily ed. July 30, 1983), and

---

**2.** *See, e.g.,* Girdner & Loftis, The Great Betrayal (1969); Grodzins, Americans Betrayed (1949); Dembitz, Racial Discrimination and the Military Judgment, 45 Colum.L.Rev. 175 (1945); Rostow, The Japanese—American Cases—A Disaster, 54 Yale L.J. 489 (1945); Freeman, Genesis, Exodus and Leviticus—Geneology, Evacuation, and Law, 28 Cornell L.Q. 414 (1943).

the adoption by the House of the Nuclear Freeze Resolution, *see* 41 Cong.Q. 868 (May 7, 1983) (reporting passage of H.J.Res. 13).

Time has overtaken *Hirabayashi* and Senate Report No. 1699. Nothing in them suggests that Congress has preempted appellants' right to plead the defense of justification provided them by our Crimes Code. Indeed, recently just the opposite has been made apparent by the Supreme Court's decision in *Silkwood v. Kerr-McGee Corp.,* — U.S. —, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). There the Court held that an award under state tort law of punitive damages against a federally-licensed manufacturer of nuclear fuel pins for use in nuclear power reactors was not preempted "either because it falls within that forbidden field [regulating the safety aspects of nuclear energy, *Pacific Gas & Electric Co. v. United States Energy Resources Conservation & Development Comm'n,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)] or because it conflicts with some other aspect of the Atomic Energy Act." At —, 104 S.Ct. at 617. After reviewing the legislative history of the Price-Anderson Act, Pub.L. 85–256, 71 Stat. 576 (1957), and amendments thereto, limiting liability for one nuclear accident, the Court observed:

> Punitive damages have long been a part of traditional state tort law. As we noted above, Congress assumed that traditional principles of state tort law would apply with full force unless they were expressly supplanted. Thus, it is Kerr-McGee's burden to show that Congress intended to preclude such awards. See *IBEW v. Foust,* 442 U.S. 42, 53 [99 S.Ct. 2121, 2128, 60 L.Ed.2d 698] (1979) (BLACKMUN, J., concurring). Yet, the company is unable to point to anything in the legislative history or in the regulations that indicates that punitive damages were not to be allowed....
>
> In sum, it is clear that in enacting and amending the Price-Anderson Act, Congress assumed that state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents. This was so

even though it was well aware of the NRC's exclusive authority to regulate safety matters. No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a state may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less.

at ___, 104 S.Ct. at 625.

We, too, "can do no less" than to retain, in cases like this, the defense of justification provided by our Crimes Code. For if Congress has not preempted state tort law, it surely has not preempted state criminal law.

### 3

In one of his last books, *Civilization and Its Discontents*, Sigmund Freud pictured us as caught in a struggle between two "Heavenly Powers"—Love, or Eros, and Death. Reflecting on the outcome, he said:

... I have not the courage to rise up before my fellow-men as a prophet, and I bow to their reproach that I can offer them no consolation: for at bottom that is what they are all demanding—the wildest revolutionaries no less passionately than the most virtuous believers.

The fateful question for the human species seems to me to be whether and to what extent their cultural development will succeed in mastering the disturbance of their communal life by the human instinct of aggression and self-destruction. It may be that in this respect precisely the present time deserves a special interest. Men have gained control over the forces of nature to such an extent that with their help they would have no difficulty in exterminating one another to the last man. They know this, and hence comes a large part of their current unrest, their unhappiness and their mood of anxiety. And now it is to be expected that the other of the two "Heavenly

Powers," eternal Eros, will make an effort to assert himself in the struggle with his equally immortal adversary. But who can foresee with what success and with what result?

S. Freud, *Civilization And Its Discontents,* 92 (W.W. Norton & Company, Inc., N.Y., 1962).

It is with Freud's final, haunting question in mind that we should decide this case. For it is this question that provides the context in which appellants' conduct must be judged.

WIEAND, Judge, concurring and dissenting.

I agree that appellants must be granted a new trial. However, I dissent vigorously from the majority's holding that upon a retrial appellants must be permitted to attempt to justify their criminal conduct by showing the reasonableness of their disagreement with national defense policies established by the Congress of the United States.

The Reverend Daniel Berrigan, the Reverend Philip Berrigan, Sister Anne Montgomery, Elmer H. Maas, the Reverend Carl Kabat, John Schuchardt, Dean Hammer and Molly Rush, the appellants, were convicted by a jury of burglary,[1] criminal mischief[2] and criminal conspiracy[3] as a result of their entering the General Electric Plant at King of Prussia where they damaged hydrogen bomb missile components being made for the United States Government. Appellants admitted that they had committed these acts. They sought to establish at trial, however, that their conduct was justified because the government's policy pertaining to the manufacture and deployment of nuclear weapons was illegal and created a threat of world disaster.[4] On appeal, they

1. 18 Pa.C.S. § 3502.

2. 18 Pa.C.S. § 3304.

3. 18 Pa.C.S. § 903.

4. As part of their proffered justification defense, appellants sought to offer evidence that the construction and deployment of missiles being manufactured by General Electric constituted preparation for aggressive warfare in violation of international law as well as treaties to

contend that the trial court erroneously excluded evidence pertaining to the objective reasonableness of the beliefs upon which they sought to base their defense of justification. More specifically, they complain that they were not permitted to present expert testimony on the consequences of nuclear warfare in order to justify their destruction of missile components manufactured by General Electric. In addition, they challenge the procedure adopted by the trial court for conducting voir dire examination of prospective jurors.

The trial court committed serious error when it excluded the public, as well as appellants' families, from the courtroom during selection of a jury. Both the Sixth Amendment to the United States Constitution and Article I, § 9 of the Pennsylvania Constitution guarantee an accused the right to a public trial. *Press-Enterprises Co. v. Superior Court of California, Riverside County,* —— U.S. ——, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); *United States v. Sorrentino,* 175 F.2d 721, 722 (3rd Cir.), *cert. denied,* 338 U.S. 868, 70 S.Ct. 143, 94 L.Ed. 532 (1949); *United States v. Kobli,* 172 F.2d 919, 921 (3rd Cir.1949); *Commonwealth v. Contakos,* 499 Pa. 340, 344, 453 A.2d 578, 580 (1982); *Commonwealth v. Johnson,* 309 Pa.Super. 367, 377, 455 A.2d 654, 659 (1982); *Commonwealth v. Wright,* 255 Pa.Super. 512, 515, 388 A.2d 1084, 1086 (1978); *Commonwealth v. Stevens,* 237 Pa.Super. 457, 467, 352 A.2d 509, 514 (1975); *Commonwealth ex rel. Paylor v. Cavell,* 185 Pa.Super. 176, 180–181, 138 A.2d 246, 248 (1958), *cert. denied,* 358 U.S. 854, 79 S.Ct. 84, 3 L.Ed.2d 88 (1958). See also: *Commonwealth v. Knight,* 469 Pa. 57, 65, 364 A.2d 902, 906 (1976). The selection of a jury is included and is part of a "trial" for purposes of applying the right to a public trial. *Press-Enterprises Co. v. Superior Court of California, Riverside County, supra; United States v. Sorrentino, supra* at 722; *Commonwealth v. Johnson, supra,* 309 Pa.Super. at 381, 455 A.2d at 661. The presence of members of the

which the United States was a party. Appellants contended that the government's illegal conduct necessitated their criminal acts.

media during the selection of the jury "does not satisfy the requirement of openness." *Commonwealth v. Contakos, supra,* 499 Pa. at 345, 453 A.2d at 580. Where a violation of an accused's right to a public trial is established, no further showing of prejudice is required. *United States ex rel. Bennett v. Rundle,* 419 F.2d 599, 608 (3rd Cir.1969); *United States v. Kobli, supra* at 921; *Commonwealth v. Knight, supra,* 469 Pa. at 65, 364 A.2d at 906; *Commonwealth v. Johnson, supra,* 309 Pa.Super. at 376, 455 A.2d at 658.

It is true, of course, that "the right to a public trial is not absolute ... [but] must be considered in relationship to other important interests." *Commonwealth v. Knight, supra,* 469 Pa. at 65, 364 A.2d at 906 (footnote omitted). Accord: *United States ex rel. Smallwood v. LaValle,* 377 F.Supp. 1148, 1151 (E.D.N.Y.1974), *aff'd,* 508 F.2d 837 (2nd Cir.1974), *cert. denied,* 421 U.S. 920, 95 S.Ct. 1586, 43 L.Ed.2d 788 (1975); *United States v. Kobli, supra* at 922; *Commonwealth v. Johnson, supra,* 309 Pa.Super. at 382–83, 455 A.2d at 661–662; *Commonwealth v. Wright, supra,* 255 Pa.Super. at 515, 388 A.2d at 1086; *Commonwealth v. Stevens, supra,* 237 Pa.Super. at 467, 352 A.2d at 514. The Pennsylvania Supreme Court, in *Commonwealth v. Knight, supra,* observed that "a court must assess all of the circumstances to determine if they present a situation in which an exclusion order is necessary. If the court determines a necessity exists, it may then issue an exclusion order; but the exclusion order must be fashioned to effectuate protection of the important interest without unduly infringing upon the accused's right to a public trial either through its scope or duration." *Id.* 469 Pa. at 66, 364 A.2d at 906 (footnote omitted). The Court observed further that an exclusion order "should generally not exclude the family and friends of an accused...." *Id.,* 469 Pa. at 69 n. 11, 364 A.2d at 908 n. 11. See also: *Commonwealth v. Burton,* 459 Pa. 550, 558, 330 A.2d 833, 837 (1974).

The record in the instant case fails to disclose any legally sufficient basis for the issuance of the trial court's exclu-

sion order. The trial judge cleared the courtroom of spectators prior to commencing voir dire on Monday, February 23, 1981, on the grounds that the presence of a forty member panel of veniremen necessitated the use of all available seats not occupied by the press. The entire panel was subsequently excused from the courtroom, and voir dire was thereafter conducted with panels of four veniremen. On Tuesday, February 24, 1981, appellants requested that the exclusion order be rescinded as the area was no longer required for the veniremen. The trial court refused to admit the public, noting that "you get a lot of noises and extraneous influences." (N.T. 123). The request of Carl Kabat that his mother be exempted from the exclusion order was denied, the trial court stating: "... for the purpose of decorum, I am going to leave it as it is with respect to the jury picking process. When the jury is ultimately picked, this will be a completely open trial." (N.T. 124). Ms. Rush's requests that her children be permitted to observe the selection of the jury were also denied. All appellants renewed their request on Thursday, February 26, 1981, that the public be admitted to the courtroom during voir dire, arguing that the Sixth Amendment guaranteed them the right to a public trial. The trial court again refused to lift the exclusion order, stating that "it would be very distracting for people to move in and out of here, as they are want [sic] to do, until such time as the jury is sworn.... The trial of the case begins when the jury is sworn and the testimony taken." (N.T. 700–701).

It is readily apparent from these facts that necessity did not support the trial court's exclusionary order. See: *Commonwealth v. Johnson, supra,* 309 Pa.Super. at 384–85, 455 A.2d at 662–663. Because appellants' right to a public trial was violated, I must agree with the majority that appellants are entitled to a new trial.

I disagree, however, that appellants should be permitted to prolong the retrial interminably by introducing evidence intended to show the reasonableness of appellants' belief that policies of national defense established by Congress

were wrong. Appellants' criminal acts cannot be sanctified merely because they hold a sincere belief that national defense policies are wrong and that they, therefore, have a higher obligation to keep those policies from being put into effect.

There can be no doubt, of course, that "[a]n accused has a fundamental right to present evidence so long as such evidence is relevant and not excluded by an established evidentiary rule. See: *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972)." *Commonwealth v. Greene*, 469 Pa. 399, 404, 366 A.2d 234, 237 (1976). Accord: *Commonwealth v. Boone*, 287 Pa.Super. 1, 10, 429 A.2d 689, 693 (1981); *Commonwealth v. Britton*, 251 Pa.Super. 335, 344, 380 A.2d 807, 811 (1977). A defendant has no right, however, to present evidence that is irrelevant to the issues being tried. In order for evidence to be legally relevant, it must first be logically relevant. The only test of logical relevance is probative value. Brown, Pennsylvania Evidence, p. 55. Relevancy means " 'the logical relationship between the proposed evidence and a fact to be established.' " *Commonwealth v. Vukovich*, 301 Pa.Super. 111, 118, 447 A.2d 267, 270 (1982), quoting 29 Am.Jur.2d 302, 303, Evidence § 252; *Reichman v. Wallach*, 306 Pa.Super. 177, 189–191, 452 A.2d 501, 508 (1982). Therefore, in order for evidence pertaining to the objective reasonableness of appellants' beliefs to be relevant and admissible, it must first be determined that appellants were entitled to raise justification as a defense to the crimes with which they were charged. After much thought and research, I have concluded that as a matter of law the defense of justification was *not* available to appellants in this case. The evidence which appellants sought to introduce at trial, therefore, was irrelevant to the issues being tried and was inadmissible.

In general, it can be said that legal justification constitutes a defense to a criminal charge. 18 Pa.C.S. § 502.

The general rule is contained in 18 Pa.C.S. § 503(a) as follows:

"(a) General rule.—Conduct which the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable if:

(1) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged;

(2) neither this title nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and

(3) a legislative purpose to exclude the justification claimed does not otherwise plainly appear."

However, the specific rule pertaining to property crimes has been set forth in 18 Pa.C.S. § 510. This section of the Crimes Code provides as follows:

"Justification in property crimes. Conduct involving the appropriation, seizure or destruction of, damage to, intrusion on or interference with property is justifiable under circumstances which would establish a defense of privilege in a civil action based thereon, unless:

(1) this title or the law defining the offense deals with the specific situation involved; or

(2) a legislative purpose to exclude the justification claimed otherwise plainly appears."

Section 510 of the Crimes Code was taken from Section 3.10 of the Model Penal Code. It is "addressed not to the use of force against the person but to conduct involving intrusion on or interference with property.... The Section is framed upon the view that in this area the penal law must on the whole accept and build upon the privileges recognized in the law of torts and property...." A.L.I., Model Penal Code, Comment to Article 3 (Tent. Draft No. 8, 1958).

The applicable tort rule appears in Sections 196 and 261 of the Restatement (Second) of Torts. These sections establish that one is privileged to enter the land of another and convert or commit a trespass to his chattels if the act is or

the actor reasonably believes it to be necessary to avert an *imminent* public disaster. If the actor believes that the impending disaster may be prevented or mitigated in some other reasonable way, the trespass is not privileged. Restatement (Second) of Torts, § 196, comment (d).

In the instant case, the record is clear that appellants' offer did not present an emergency situation in which a public disaster was imminent. There was no immediate emergency requiring appellants to trespass upon the property of General Electric and destroy missile components. Moreover, it was unreasonable as a matter of law to believe that nuclear war could be avoided merely by destroying one of several components being separately made for incorporation into *future* nuclear missiles. Appellants' acts simply were not the type of conduct which is privileged under the existing law of torts. Appellants were not privileged to destroy another person's property in the hope that "their action ... might accelerate a political process ultimately leading to the abandonment of nuclear missiles." (Concurring op. at p. 1115). Their trespass upon and destruction of private property under the circumstances of this case rendered them liable both civilly and criminally.

To permit appellants to justify their criminal invasion and destruction of private property because they believed there was inherent in such property a potential for future catastrophe would be equivalent to allowing the theft and destruction of privately owned guns or ammunition by altruistic and well meaning citizens who sincerely believe that guns and ammunition possess the potential to kill at some time in the future. To permit each person to act according to his own belief in such cases is to achieve anarchy and chaos. This was not the purpose of the limited privilege granted by the Crimes Code. The cornerstone of the tort privilege is an emergency requiring immediate action to prevent greater harm. The privilege does not exist where the lack of immediacy permits the use of other means to prevent the harm. Private citizens cannot be permitted to take and destroy their neighbors' property because of a

belief that at some unascertained future time the property may be used to achieve a greater evil.

Similarly, the law does not allow a citizen to justify his or her criminal conduct by a subjective disagreement with a policy decision previously made by duly constituted authority. Both Section 503 and Section 510 of the Crimes Code exclude justification as a defense to a criminal charge if a legislative purpose to exclude the justification plainly appears. See: 18 Pa.C.S. §§ 503(a)(3) and 510(2). Such a legislative purpose exists in the instant case and precludes justification as a defense to the crimes charged.

The plenary war powers of the United States Government include the exclusive right to enact all legislation necessary to provide for the common defense. U.S. Const. art. 1, § 8, cl. 1; *Ex Parte Quirin*, 317 U.S. 1, 25–26, 63 S.Ct. 2, 9–10, 87 L.Ed. 3 (1942). "The war power of the national government is 'the power to wage war successfully.' See Charles Evans Hughes, War Powers Under the Constitution, 42 ABA Rep 232, 238. It extends to every matter and activity so related to war as substantially to affect its conduct and progress. The power is not restricted to the winning of victories in the field and the repulse of enemy forces. It embraces every phase of the national defense, including the protection of war materials...." *Hirabayashi v. United States*, 320 U.S. 81, 93, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). See also: *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), *reh. denied*, 393 U.S. 900, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968); *McKinley v. United States*, 249 U.S. 397, 39 S.Ct. 324, 63 L.Ed. 668 (1919); *Pauling v. McElroy*, 107 U.S.App.D.C. 372, 374, 278 F.2d 252, 254 (1960), *cert. denied*, 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960); 78 Am.Jur.2d, War, § 18. Pursuant to these powers Congress enacted the Atomic Energy Act of 1954,[5] 42 U.S.C. § 2011 et seq., with the aim of assuring

---

**5.** The Atomic Energy Act of 1954 was enacted pursuant to "the constitutional powers of the United States, including, among others, to provide for the common defense; to raise and support armies; to provide and maintain a navy; to make all needful rules and regulations respecting the territory or other property belonging to the

"that atomic energy makes the maximum contribution to the general welfare of the Nation, subject to the *paramount objective of having it make the maximum contribution to the common defense and security ....*" S.Rep. No. 1699, 83rd Cong., 2nd Sess., reprinted in 1954 U.S.Code Cong. & Ad.News 3456, 3465. (emphasis supplied). See also: 42 U.S.C. § 2011(a). Congress has also specifically prohibited the destruction of national defense materials. Thus, 18 U.S.C. § 2155 provides:

> "Destruction of national-defense materials, national-defense premises or national-defense utilities——
>
> (a) Whoever, with intent to injure, interfere with, or obstruct the national defense of the United States, willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any national-defense material, national-defense premises, or national-defense utilities, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.
>
> (b) If two or more persons conspire to violate this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be punished as provided in subsection (a) of this section."

This proscription applies to missile components destroyed by appellants in this action. In 18 U.S.C. § 2151, national-defense materials are defined to include, inter alia:

> "arms, armament, ammunition, livestock, forage, forest products and standing timber, stores of clothing, air, water, food, foodstuff, fuel, supplies, munitions, and all other articles of whatever description and any part or ingredient thereof, intended for, adapted to, or suitable for the use of the United States in connection with the national defense or for use in or in connection with the producing, manufacturing, repairing, storing, mining, ex-

United States; and to regulate commerce with foreign nations and among the several States." S.Rep. No. 1699, 83rd Cong., 2nd Sess., reprinted in 1954 U.S.Code Cong. & Ad.News 3465.

tracting, distributing, loading, unloading, or transporting of any of the materials or other articles hereinbefore mentioned or any part or ingredient thereof."

Article VI, clause 2, of the United States Constitution provides that the ". . . Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and *the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.*" (emphasis supplied). See: *Hauenstein v. Lynham,* 100 U.S. 483, 490, 10 Otto. 483, 25 L.Ed. 628 (1880). Therefore, when a Congressional *"purpose* to exclude the justification claimed" appears, the courts of this Commonwealth are bound thereby in their interpretation of Sections 503 and 510 of the Crimes Code.[6]

Appellants argue that their conduct was justified because nuclear weapons pose a threat to the health and existence of every human being. The catastrophic powers of such weapons cannot be denied. However, Congress, being cognizant of the dangers inherent in nuclear weapons, has determined that such weapons are a necessary component of our national defense strategy. Senate Report No. 1699, discussing the Atomic Energy Act of 1954, notes, inter alia:

"[O]ur Nation has developed, in the form of our atomic-weapon stockpile, a degree of deterring power which may well constitute the free world's greatest material asset in its effort to avert another worldwide war. The elementa-

---

**6.** Appellants have not argued that Congressional action regarding nuclear missiles has so pre-empted the field as to preclude the states from enforcing criminal laws enacted for the protection of private property when such property consists of nuclear missile components manufactured by a non-governmental corporation, and that issue is not before us. Nevertheless, it may be observed that the Crimes Code is no less enforceable against appellants than it is in cases involving robberies of national banks. See: *Commonwealth ex rel. O'Brien v. Burke,* 171 Pa.Super. 273, 90 A.2d 246 (1952); *Commonwealth v. Braun,* 34 Leh.L.J. 231, 233–234 (1971). See also: *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959).

ry requirements of national security have compelled us to give military uses of the atom top priority. . . .

"Yet we are aware that legislation, standing by itself, can never substitute for prudent and courageous administration of our atomic enterprise by the responsible officials of the executive branch, for continuing understanding and support of our atomic program in the Congress, and—most of all—for that enlightened and informed public opinion which is the bedrock of wise national policy in our democratic society.

"We have every confidence that the domestic problems created by atomic energy can be resolved through the application of wisdom, willingness of compromise, and good will. We are no less confident that the critical international problems arising out of the growth of nuclear stockpiles could likewise be amenable to resolution through these same means."

S.Rep. No. 1699, 83rd Cong., 2nd Sess., reprinted in 1954 U.S.Code Cong. & Ad.News 3457, 3465.

Congress has thus made deliberate choices regarding nuclear armaments and has enacted comprehensive legislation [7] dealing with the very issue which appellants contend should now be submitted to a jury in order to determine whether their conduct was a reasonable choice of a lesser evil. Such was not the intent or purpose of the legislature in enacting Sections 503 and 510 of the Crimes Code. Congress has already balanced the "evil" asserted by appellants to be motivation for their acts, and has declared it necessary for the common good.

The Comment to Section 3.02 of the Model Penal Code, upon which 18 Pa.C.S. § 503 is based, provides, inter alia:

"Justification Generally: *Choice of Evils*

1. This Section accepts the view that a principle of necessity, properly conceived, affords a general justification for conduct that otherwise would constitute an offense; and that such a qualification, like the require-

---

7. Atomic Energy Act of 1954, 42 U.S.C. § 2011 et seq., Energy Reorganization Act of 1974, 42 U.S.C. § 5801 et seq.

ments of culpability, is essential to the rationality and justice of all penal prohibitions.

The principle is subject to three vital limitations:

(a) The necessity must be avoidance of an evil greater than the evil sought to be avoided by the law defining the offense charged. The balancing of evils cannot, of course, be committed merely to the private judgment of the actor; it is an issue for determination in the trial. *What is involved may be described as an interpretation of the law of the offense, in light of the submission that the special situation calls for an exception to the prohibition that the legislature could not reasonably have intended to exclude,* given the competing values to be weighed.

(b) *The issue of competing values must not have been foreclosed by a deliberate legislative choice, as when the law has dealt explicitly with the specific situation that presents the choice of evils* or a legislative purpose to exclude the justification claimed otherwise appears." (emphasis supplied) (footnote omitted).

"The defense of necessity is based on the policy that there are times when a higher value is protected by violating a less significant value; that the greater good for society can, in some instances, only 'be accomplished by violating the literal language of the criminal law.... The matter is often expressed in terms of choice of evils: When the pressure of circumstances presents one with a choice of evils, the law prefers that he avoid the greater evil by bringing about the lesser evil.'" *State v. Olsen,* 99 Wis.2d 572, 299 N.W.2d 632, 634 (1980), quoting LaFave and Scott, Criminal Law § 50, at 382 (1972). Accord: *State v. Warshow,* 138 Vt. 22, 410 A.2d 1000, 1003 (1979) (Hill, J., concurring); *Commonwealth v. Brugmann,* 13 Mass.App. 373, 433 N.E.2d 457, 460 (1982); *State v. Marley,* 54 Haw. 450, 509 P.2d 1095, 1109 (1973). See also: Arnolds and Garland, The Defense of Necessity in Criminal Law: The Right to Choose the Lesser Evil, 65 J.Crim.L. & Criminology 289, 291–296 (1974). "Determination of the issue of

competing values and, therefore, the availability of the defense of necessity is precluded, however, when there has been a deliberate legislative choice as to the values at issue." *State v. Warshow, supra* 410 A.2d at 1003. See also: *United States v. Kroncke*, 459 F.2d 697, 701 (8th Cir.1972); *State v. Dorsey*, 118 N.H. 844, 395 A.2d 855, 857 (N.H.1978); *State v. Greene*, 5 Kan.App.2d 698, 623 P.2d 933, 936 (1981).

In the instant case, the purpose of appellants' conduct was to prevent the future production of nuclear missiles because of their potential for devastation. Congress, however, had already determined that despite a potential for disastrous consequences, the greater good required that such missiles be produced and deployed. Individual citizens, such as the appellants in this case, cannot nullify the Congressional decision made in the interests of national defense by seizing and destroying property intended for use in accordance with such Congressional determination. Similarly, the law pertaining to justification as a defense to criminal conduct does not permit a court or jury to overrule a properly made Congressional determination regarding the use of nuclear power for national defense. The peoples' elected representatives in Congress have adopted the Atomic Energy Act of 1954, 42 U.S.C. § 2011 et seq., and the Energy Reorganization Act of 1974, 42 U.S.C. § 5801 et seq., and have thereby concluded that the national defense requires the production and deployment of nuclear weapons.

The judiciary is without power to review the wisdom of this determination which is within the discretion vested in Congress by the Constitution. *Hirabayashi v. United States, supra,* 320 U.S. 81 at 93, 63 S.Ct. 1375, at 1382, 87 L.Ed. 1774 (1943); *Pauling v. McNamara*, 331 F.2d 796, 798 (U.S.App.D.C.1963), *cert. denied*, 377 U.S. 933, 84 S.Ct. 1336, 12 L.Ed.2d 297 (1964); *Pauling v. McElroy, supra* 107 U.S.App.D.C. at 374, 278 F.2d at 254. See also: *United States v. May*, 622 F.2d 1000, 1009 (9th Cir.1980), *cert. denied*, 449 U.S. 984, 101 S.Ct. 402, 66 L.Ed.2d 247 (1980).

Our democratic form of government is based upon separation of powers. The power and duty to provide for a national defense is vested in the Congress. The wisdom or folly of its decisions is an issue for public debate, to be resolved through the electoral process. To hold that those who sincerely believe that nuclear weapons pose a threat to society may destroy components thereof and then defend the destruction of private property by a defense which requires a jury to consider complex issues of foreign policy, already resolved by authorities vested with responsibility for such decisions, is to miscomprehend the purpose and rationale of the justification defense. It may be noted that appellants have *not* at any time argued that they were justified in destroying the missile components because the General Electric factory was producing missiles which were uniquely dangerous by virtue of improper construction or violations of federal safety regulations. Rather, they have argued that their sincerely held, allegedly reasonable beliefs concerning the dangers inherent in the government's policy of producing and storing nuclear armaments justified their criminal conduct.

The Comment to Section 3.02 of the Model Penal Code makes it clear that the defense of justification can have no application to crimes committed in order to focus public attention on issues of public policy. Where, as here, there is no *"special situation* [which] calls for an exception" but simply a law or policy which the individual considers morally unacceptable, the defense of justification is not available. To hold otherwise would be to create, contrary to the intent of the legislature, a complete defense for all acts of civil disobedience where the evil perceived by the individual is greater than the evil sought to be avoided by the offense charged, even though the legislature, aware of the "evil" perceived, has determined that such a policy is required for the common good. This is not the intent of Sections 503 and 510 of the Crimes Code.

Nonviolent civil disobedience has effected changes for the benefit of humanity in many instances, and I do not suggest

that nonviolent civil disobedience has no place in the public debate over military and domestic uses of nuclear power. However, even the strongest proponents of civil disobedience have long recognized that " '[o]ne who breaks an unjust law must do it openly ... and with a willingness to accept the penalty.' " *Commonwealth v. Averill,* 12 Mass. App. 260, 423 N.E.2d 6, 7 n. 2 (1981), quoting M.L. King, Jr., Why We Can't Wait, p. 86 (1964).[8] As Judge Sobeloff so eloquently observed in a case involving one of the appellants in the instant appeal:

"From the earliest times when man chose to guide his relations with fellow men by allegiance to the rule of law rather than force, he has been faced with the problem how best to deal with the individual in society who through moral conviction concluded that a law with which he was confronted was unjust and therefore must not be followed. Faced with the stark reality of injustice, men of sensitive conscience and great intellect have sometimes found only one morally justified path, and that path led them inevitably into conflict with established authority and its laws. Among philosophers and religionists throughout the ages there has been an incessant stream of discussion as to when, if at all, civil disobedience, whether by passive refusal to obey a law or by its active breach, is morally justified. However, they have been in general agreement that while in restricted circumstances a morally motivated act contrary to law may be ethically justified, the action must be non-violent and the actor must accept the penalty for his action. *In other words, it*

---

**8.** See also: Hermann, Justice and Order: A Preliminary Examination of the Limits of Law, 45 Wash.L.Rev. 335 (1970); Rosen, Civil Disobedience and Other Such Techniques: Law Making Through Law Breaking, 37 Geo.Wash.L.Rev. 435 (1969); Smith, The Legitimacy of Civil Disobedience as a Legal Concept, 36 Fordham L.Rev. 707 (1968); Civil Disobedience: A Case for Separate Treatment, 14 Wayne L.Rev. 1165 (1968); Griswold, Dissent—1968, 42 Tulane L.Rev. 726 (1968); Civil Disobedience: A Study of Law and Its Relation to Society, 13 S.Dak.L. Rev. 356 (1968); C. Whittaker and W. Coffin, Jr., Law, Order, and Civil Disobedience (1967); Allen, Civil Disobedience and the Legal Order, 36 U.Cin.L.Rev. 175 (1967); Cohen, Freeman and Van den Haag, Civil Disobedience and the Law, 21 Rutgers L.Rev. 1 (1966).

*is commonly conceded that the exercise of a moral judgment based upon individual standards does not carry with it legal justification or immunity from punishment for breach of the law.*

*"The defendants' motivation in the instant case—the fact that they engaged in a protest in the sincere belief that they were breaking the law in a good cause—cannot be acceptable legal defense or justification.* Their sincerity is beyond question. It implies no disparagement of their idealism to say that society will not tolerate the means they chose to register their opposition . . . ."

*United States v. Moylan,* 417 F.2d 1002, 1008–1009 (4th Cir.1969), *cert. denied,* 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970) (emphasis supplied) (footnotes omitted). See also: *State v. Olsen, supra* 299 N.W.2d at 635; *United States v. Kroncke, supra* at 703; *Commonwealth v. Averill, supra* 423 N.E.2d at 7.

I have attempted to show that, contrary to the majority, the courts which have already considered this issue have correctly, not erroneously, held that justification is not an available defense to crime when the competing harms have been considered and a deliberate legislative choice has been made. Because, in my judgment, the defense of justification is not available to the appellants, it follows that evidence pertaining to the horrors of nuclear warfare is not probative of any issue in this case and, therefore, is irrelevant. As such, it should be excluded from a subsequent retrial.

I also disagree with the majority's decision that it was reversible error for the trial court to conduct voir dire examination of prospective jurors in groups of four. It is well settled that the single goal of the voir dire examination is to provide an accused with a "competent, fair, impartial and unprejudiced jury." *Commonwealth v. Futch,* 469 Pa. 422, 426, 366 A.2d 246, 248 (1976). Accord: *Commonwealth v. Christian,* 480 Pa. 131, 139, 389 A.2d 545, 549 (1978); *Commonwealth v. England,* 474 Pa. 1, 6, 375 A.2d 1292, 1295 (1977); *Commonwealth v. Johnson,* 452 Pa. 130,

134, 305 A.2d 5, 7 (1973); *Commonwealth v. Holland,* 298 Pa.Super. 289, 291, 444 A.2d 1179, 1180 (1982); *Commonwealth v. Davis,* 282 Pa.Super. 51, 54, 422 A.2d 671, 672 (1980); *Commonwealth v. Short,* 278 Pa.Super. 581, 590, 420 A.2d 694, 698 (1980); *Commonwealth v. Mayo,* 272 Pa.Super. 115, 119, 414 A.2d 696, 698 (1979). The provisions of Pa.R.Crim.P. 1106(e)[9] specifically provide in non-

**9. Rule 1106. Examination and Challenges of Trial Jurors**

(a) Voir dire of prospective trial jurors and prospective alternate jurors shall be conducted, and the jurors shall be selected, in the presence of a judge.

(b) This oath shall be administered individually or collectively to the prospective jurors:

"You do solemnly swear by Almighty God (or do declare and affirm) that you will answer truthfully all questions that may be put to you concerning your qualifications for service as a juror."

(c) Voir dire, including the judge's ruling on all proposed questions, shall be recorded in full unless the recording is waived. The record will be transcribed only upon written request of either party or order of the judge.

(d) The judge may require the parties to submit in writing a list of proposed questions to be asked of the jurors regarding their qualifications. The judge may permit the defense and the prosecution to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event, the Court shall permit the defense and the prosecution to supplement the examination by such further inquiry as it deems proper.

(e) In capital cases, the individual voir dire method must be used, unless the defendant waives that alternative. In non-capital cases, the trial judge shall select one of the following alternative methods of voir dire, which shall apply to the selection of both jurors and alternates:

(1) **Individual Voir Dire and Challenge System**

(A) Voir dire of prospective jurors shall be conducted individually and may be conducted beyond the hearing and presence of other jurors.

(B) Challenges, both peremptory and for cause, shall be exercised alternately beginning with the attorney for the Commonwealth, until all jurors are chosen. Challenges shall be exercised immediately after the prospective juror is examined. Once accepted by all parties, a prospective juror shall not be removed by peremptory challenge. Without declaring a mistrial, a judge may allow a challenge for cause at any time before the jury begins to deliberate, provided sufficient alternates have been selected, or the defendant consents to be tried by a jury of less than twelve, pursuant to Rule 1103.

(2) **List System of Challenges**

(A) A list of prospective jurors shall be prepared. The list shall contain a sufficient number of prospective jurors to total at least

capital cases for the exercise of discretion by the trial court in selecting the method by which voir dire examination shall be conducted. See: *Commonwealth v. Gore,* 262 Pa.Super. 540, 557, 396 A.2d 1302, 1310 (1978); *Commonwealth v. Howard,* 248 Pa.Super. 246, 251, 375 A.2d 79, 82 (1977); *Commonwealth v. Herron,* 243 Pa.Super. 319, 330, 365 A.2d 871, 876 (1976). While individual voir dire conducted beyond the hearing and presence of other jurors "may be the 'more desirable practice', such determination is a trial matter, committed to the sound discretion of the trial court." *Commonwealth v. Stoltzfus,* 462 Pa. 43, 54, 337 A.2d 873, 878 (1975) quoting *Commonwealth v. Martinolich,* 456 Pa. 136, 146, 318 A.2d 680, 686 (1974), *cert. denied,* 419 U.S. 1065, 95 S.Ct. 651, 42 L.Ed.2d 661 (1974). See also: *United States v. Addonizio,* 451 F.2d 49, 67 (3rd Cir.1972), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); *Commonwealth v. Smith,* 290 Pa.Super. 33, 41–42, 434 A.2d 115, 119 (1981); *Commonwealth v. Herron, supra* 243 Pa.Super. at 331, 365 A.2d at 876. Cf. *Commonwealth v. Kampo,* 480 Pa. 516, 530–531, 391 A.2d 1005, 1012 (1978); *Commonwealth v. Johnson,* 440 Pa. 342, 351–352, 269 A.2d

twelve, plus the number of alternates to be selected, plus the total number of peremptory challenges (including alternates).

(B) Prospective jurors may be examined collectively or individually, regarding their qualifications. If the jurors are examined individually, the examination may be conducted beyond the hearing and presence of other jurors.

(C) Challenges for cause shall be exercised orally as soon as the cause is determined.

(D) When a challenge for cause on the list below the number has been sustained, which brings the total number of twelve (12) plus alternates plus peremptory challenges (including alternates), additional prospective jurors shall be added to the list.

(E) Each prospective juror subsequently added to the list may be examined as set forth in paragraph (e)(2)(B).

(F) When the examination has been completed and all challenges for cause have been exercised, peremptory challenges shall then be exercised by passing the list between prosecution and defense, with the prosecution first striking the name of a prospective juror, followed by the defense, and alternating thereafter until all peremptory challenges have been exhausted. If either party fails to exhaust all peremptory challenges, the jurors last listed shall be stricken. The remaining jurors and alternates shall be seated; but no one shall disclose which party peremptorily struck any juror.

752, 756 (1970). Based upon the record in the instant case, I find no abuse of discretion on the part of the trial court as a result of its decision to conduct voir dire with groups of four veniremen. See: *Commonwealth v. Dolhancryk,* 273 Pa.Super. 217, 223, 417 A.2d 246, 249 (1979).

Upon a retrial, a determination regarding the manner of conducting voir dire will again require the exercise of discretion by the trial judge. I believe there are valid reasons for placing that discretion in the trial court; and, therefore, I do not join the majority's mandatory instruction that voir dire can only be conducted individually.

In summary, I would agree that the trial court's exclusion of the public from the jury selection process was error which requires the granting of a new trial. However, I cannot agree that a retrial should be allowed to become a public forum in which the parties and their witnesses debate the wisdom of Congressionally established policies of national defense as they pertain to the production and deployment of nuclear missiles. This is not the function of a court of law. To permit it in this case will be to drown the issue of guilt or innocence in a sea of irrelevancy. From this portion of the majority's holding, therefore, I must respectfully, but strenuously, dissent.

HESTER and JOHNSON, JJ., join in this opinion.