Thomas ANDREWS, Debra Beldock, Leah Bradley, Carolyn Brinski, Christopher Bove, Katheryn Carfrae, Robert Carlsten, Paul Crosson, Jay Dillon, Nancy C. Doub, Gary E. Erb, Shelly Evelo, Robert Fogerty, Lynn Ford, Daniel Garcia, Ellen N. Geller, John Grahm, Wendy Graves, Scott Greenberg, Elliot Greenspan, Jeffrey Goldstein, Ann Grodsky, John Haggerty, Deborah Hyppa, John Keim, Edelle Kinsinger, James Kinsinger, Steven Kless, Edward Kreiser, David Kreutzer, Jennifer Lee, Leslie Mah, Jane Martinez, Theresa McBride, Suzann Mc-

Donough, Lisa Palty, Alice Reich, Kenneth Reimer, Keith Scholnik, Laura Shortidge, Diana Spalding, Robert Spira, Eleanor Swanson, Cathy Swedlund, Margaret Sweeney, Terri Theisen, Barbara Van Winkle, Scott Villalva, Bridgett Ware, Ann White, and Ralph Young, Petitioners,

v.

The PEOPLE of the State of Colorado, Respondent.

No. 89SC545.

Supreme Court of Colorado, En Banc.

Nov. 13, 1990.

Eugene Deikman, P.C., Eugene Deikman, Denver, for petitioners.

Donald E. Mielke, Dist. Atty., Donna Skinner Reed, Chief Appellate Deputy Dist. Atty., Golden, for respondent.

1. The following persons provided affidavits supporting the offer of proof: Elise Boulding, Adjunct Professor of Sociology at the University of Colorado at Boulder; George A. Johnson, practicing attorney; Carl J. Johnson, former Director of the Jefferson County Department of Health; Arthur Kinoy, Professor of Law at Rutgers University School of Law; Robert C. Aldridge, Aerospace Engineer with a nuclear weapons design background; Joseph Goldfield, Engineering Consultant in the fields of energy

Justice ERICKSON delivered the Opinion of the Court.

The defendant-petitioners were tried and convicted by a jury in the Jefferson County Court of obstructing a roadway without a legal privilege to do so, and of disobeying the request of a peace officer to move to prevent the obstruction of the roadway in violation of sections 18–9–107(1)(a) & (b), 8B C.R.S. (1986). An appeal was taken to the Jefferson County District Court, which affirmed the convictions. We granted certiorari to determine whether the trial court erred in ruling that the defendants' offer of proof was insufficient as a matter of law to provide the necessary foundation for invoking the choice of evils defense. We affirm.

I

On August 9, 1987, several hundred people blocked the roadway to the east entrance of the Rocky Flats nuclear weapons plant in Jefferson County. The protest was intended to halt the manufacture of plutonium triggers by preventing the entry of workers and materials into the federal facility. The ultimate goal of the protest was to close down the Rocky Flats facility and force its conversion to a non-nuclear civilian use.

■ The defendants were charged and pled not guilty to violating sections 18–9–107(1)(a) & (b). Prior to trial, the defendants jointly served notice of their intent to employ the choice of evils defense set forth in section 18–1–702, 8B C.R.S. (1986). The choice of evils defense was created by statute and may only be invoked when an offer of proof is made that establishes the requisite statutory foundation.

The defendants' offer of proof consisted of fifteen affidavits from experts in the fields of sociology, international law, public health, and nuclear weapons production.[1]

conservation, environmental engineering, air pollution control and industrial hygiene engineering; Francis A. Boyle, Professor of Law at the University of Illinois; Walter L. Gerash, practicing attorney; John Candler Cobb, Professor Emeritus of Preventive Medicine and Community Health at the University of Colorado Health Sciences Center; Howard Zinn, Professor of Political Science at Boston University; Daniel Ellsberg, lecturer, writer, and political

Defense counsel advised the court that the affiants were willing to testify as expert witnesses at trial. The trial court ruled that the offer of proof was insufficient as a matter of law to establish the statutory foundation required for the choice of evils defense.

At trial, the defendants did not deny they were obstructing traffic and disobeyed the request of the State Patrol officers to move. The jury found all the defendants guilty of obstructing a highway or other passage area, and convicted most of the defendants of disobeying a reasonable request of a peace officer. The sentences imposed ranged from four to sixteen hours of community service, and fines of $40 to $100.

On appeal, the district court affirmed the trial court's decision on the defendants' failure to lay a proper foundation for the choice of evils defense. We agree.

## II

Section 18-1-702, 8B (1986), defines and limits the choice of evils defense:

> (1) [C]onduct which would otherwise constitute an offense is justifiable and not criminal when it is *necessary* as an *emergency measure* to avoid an *imminent public or private injury which is about to occur* ... and which is of sufficient gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding the injury clearly outweigh the desirability of avoiding the injury sought to be pre-

vented by the statute defining the offense in issue.

> (2) ... When evidence relating to the defense of justification under this section is offered by the defendant, before it is submitted for the consideration of the jury, *the court shall first rule as a matter of law whether the claimed facts and circumstances would, if established, constitute a justification.*

(Emphasis added.)

■ The statutory codification of the choice of evils defense has its roots in the common law doctrine of necessity. *People v. Strock*, 623 P.2d 42, 44 (Colo.1981); *People v. Robertson*, 36 Colo.App. 367, 543 P.2d 533 (1975).[2] The choice of evils defense thus does not arise from a "choice" of several courses of action, but rather is based on a real emergency involving specific and imminent grave injury that presents the defendant with no alternatives other than the one taken.[3] *Strock*, 623 P.2d at 44; *Robertson*, 36 Colo.App. at 367, 543 P.2d at 533; *see also United States v. Dorrell*, 758 F.2d 427, 431 (9th Cir.1985); *United States v. Seward*, 687 F.2d 1270, 1275–76 (10th Cir.1982).

In Colorado, the choice of evils defense has been upheld as an affirmative defense to prison escapes when the inmate faced a choice between escape and imminent death or homosexual rape. *See Strock*, 623 P.2d at 42; *People v. Handy*, 198 Colo. 556, 603 P.2d 941 (1979). We have narrowly construed the statute and have required that threats of murder or homosexual rape must be specific with imminent threats of

activist; Richard Anderson Falk, Professor of International Law and Practice at Princeton University; Paul Wehr, Associate Professor and Chair of Sociology, University of Colorado at Boulder; Ved P. Nanda, Professor of Law and Director of the International Legal Studies Program at the University of Denver College of Law; Haywood Burns, Dean of the City University of New York School of Law at Queens College.

2. The Colorado statute was derived from section 3.02 of the Model Penal Code and section 65.00(2) of the New York Penal Code. Illustrations of the intended application of the choice of evils defense include blasting buildings to prevent a major fire from spreading, appropriating foodstuffs in time of famine, or forcibly restraining

a person infected with a highly contagious and dangerous disease. Comment to § 40-1-801, 3 C.R.S. (1971 Supp.).

3. No state has enacted legislation that makes the choice of evils defense available as a justification for behavior that attempts to bring about social and political change outside the democratic governmental process. A Pennsylvania appellate court did permit the use of the choice of evils defense for civil disobedience in two cases, but the Pennsylvania Supreme Court reversed the court of appeals in both cases. *Commonwealth v. Berrigan*, 325 Pa.Super. 242, 472 A.2d 1099 (1984), *rev'd* 509 Pa. 118, 501 A.2d 226 (1985); *Commonwealth v. Capitolo*, 324 Pa.Super. 61, 471 A.2d 462 (1984), *rev'd*, 508 Pa. 372, 498 A.2d 806 (1985).

injury to the inmate that provide no reasonable alternative under the circumstances but escape. *People v. McKnight*, 626 P.2d 678, 681 (Colo.1981).[4]

### III

■ Before a defendant can present a choice of evils defense to the jury, section 18–1–702 requires that the trial court make an initial determination of whether the allegations of facts by the defendant, if proved, would constitute legal justification for the prohibited conduct. *People v. Dover*, 790 P.2d 834, 836 (Colo.1990); *Strock*, 623 P.2d at 46; *United States v. Cullen*, 454 F.2d 386, 390 (7th Cir.1971).

### A

■ The choice of evils statute requires that the defendant establish that the crime committed was *necessary* to prevent an imminent injury. A sufficient offer of proof must therefore establish: (1) all other potentially viable and reasonable alternative actions were pursued, or shown to be futile,[5] (2) the action taken had a direct causal connection with the harm sought to be prevented, and that the action taken would bring about the abatement of the harm,[6] and, (3) the action taken was an emergency measure pursued to avoid a specific, definite, and imminent injury about to occur.[7]

■ The defendants claim that they had previously sought to stop production at the Rocky Flats facility by public demonstrations and lobbying, and that the use of conventional methods of demonstration and protest had been inadequate. Neither the offer of proof nor the fifteen supporting affidavits contain facts that, if proved, would show the defendants tried other potentially viable and reasonable alternatives,[8] or that any other alternatives would be futile.[9] *Dover*, 790 P.2d at 836; *McKnight*, 626 P.2d at 681; *Strock*, 623 P.2d at 44; *Dorrell*, 758 F.2d at 431 (mere impatience with the political process does not constitute necessity); *Seward*, 687 F.2d at 1275 (if courses of action, other than criminal trespass, are available, then no necessity exists); *In re Weller*, 164 Cal. App.3d 44, 210 Cal.Rptr. 130 (1985) (proof of unsuccessful political participation by defendants is not sufficient to demonstrate that all alternatives have been exhausted).

The defendants claim the demonstration did affect public attitudes, and resulted in basic policy changes being made with regard to the continued maintenance and operation of the Rocky Flats facility. The defendants did not, however, allege facts that, if proved, would establish that the protest brought about the termination or prevention of the harm they were protesting. *Dorrell*, 758 F.2d at 433 (vandalism of military base not sufficient to lead to the termination of the MX missile program); *United States v. May*, 622 F.2d 1000, 1008 (9th Cir.1980) (illegal entry onto naval base not sufficient to eliminate the Trident mis-

---

**4.** The inmate must also effect the escape without violence, and must immediately report to the proper authorities when he reaches a position of safety. *People v. McKnight*, 626 P.2d at 681.

**5.** *Dover*, 790 P.2d at 836; *Strock*, 623 P.2d at 44; *Dorrell*, 758 F.2d at 431; *Seward*, 687 F.2d at 1275; *State v. Marley*, 54 Haw. 450, 509 P.2d 1095, 1109 (1973).

**6.** *Dorrell*, 758 F.2d at 430; *United States v. May*, 622 F.2d 1000, 1008 (9th Cir.) *cert. denied*, 449 U.S. 984, 101 S.Ct. 402, 66 L.Ed.2d 247 (1980); *United States v. Simpson*, 460 F.2d 515, 518 (9th Cir.1972).

**7.** *Handy*, 603 P.2d at 943; *People v. Trujillo*, 41 Colo.App. 223, 225, 586 P.2d 235, 237 (1978); *Robertson*, 36 Colo.App. at 369, 543 P.2d at 535.

Colorado is one of the few states to require that the measure taken to avoid the imminent injury must be an emergency measure. This demonstrates the General Assembly's intent to narrow the application of the choice of evils defense.

**8.** In fact, the supporting affidavits state in numerous places, "There are conventional means available to citizens of the State of Colorado and of the United States to protest and attempt to change environmental hazards and other evils, . . ." The affidavits then proceed to list numerous alternatives.

**9.** An offer of proof is also insufficient if it merely alleges other persons have attempted to pursue reasonable alternatives, or that the action taken was a more effective alternative. *Dorrell*, 758 F.2d at 431; *Seward*, 687 F.2d at 1275.

sile program); *United States v. Simpson,* 460 F.2d 515, 518 (9th Cir.1972) (burning the file room of local draft board not sufficient to end the Vietnam War); *Commonwealth v. Averill,* 12 Mass.App. 260, 423 N.E.2d 6, 7–8 (1981) (publicity of defendant's arrest not sufficient to abate an immediate peril).[10]

Finally, the defendants assert that the evils presented by the Rocky Flats facility in terms of the threat to the environment and in terms of enhancing the risk of nuclear war were imminent in the context of the magnitude and nature of the evil. Although the defendants' affidavits articulate the radiation hazards and the dangers of nuclear war associated with the operation of Rocky Flats, these dangers are long-term and speculative, and thus insufficient to demonstrate that a specific, definite, and imminent injury is about to occur as required by section 18–1–702. *Handy,* 603 P.2d at 943; *People v. Trujillo,* 41 Colo. App. 223, 225, 586 P.2d 235, 237 (1978); *Robertson,* 36 Colo.App. at 369, 543 P.2d at 535 (generalized fear of injury is not sufficient); *May,* 622 F.2d at 1009 (harm must be direct and to the defendant; a possible future harm to members of the society is not sufficient).

The judgment of the district court is affirmed.

QUINN, J., dissents.

Justice QUINN dissenting:

I respectfully dissent. The majority, in my view, has construed the statutory choice of evils defense in section 18–1–702, 8B C.R.S. (1986), in a manner not intended by the statutory text and in derogation of the defendants' right to a jury trial on that defense.

It is appropriate at the outset to clarify what this case is not about. This case does not turn on whether the Rocky Flats nuclear weapons plant was operating contrary to

law. I assume, and have no reason to believe otherwise, that the plant was operating in accord with both federal and state law when the defendants' conduct occurred. Nor is the question before us whether the defendants should be acquitted as a matter of law for the class 3 misdemeanors of obstructing a highway and disobeying the police officer's order to move from that location. *See* § 18–9–107(1), 8B C.R.S. (1986). Rather, the sole question raised by this case is whether the defendants were entitled to present evidence to the jury on the statutory affirmative defense of choice of evils so that the jury could consider that defense during its deliberations. In my opinion, the defendants were entitled to no less, and the trial court erred in striking the choice of evils defense from this case.

I.

Section 18–1–702 creates the choice of evils defense as a justification for conduct that otherwise might be criminal. The statute, in pertinent part, provides that conduct that would otherwise be criminal is justified under the following conditions: (1) the conduct engaged in by the defendant was necessary as an emergency measure to avoid an imminent public or private injury; (2) the public or private injury was about to occur because of a situation occasioned or developed through no conduct of the defendant; and (3) the public or private injury was of sufficient gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding the injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the offense committed by the defendant. Subsection 18–1–702(1) states that, in order to qualify for the choice of evils defense, the defendant's conduct must not be inconsistent with those provisions of the law defining justifiable use of physical force. Furthermore, the

**10.** The offer of proof and affidavits also fail to distinguish between the effect of criminal actions and the effect of legal actions taken by the protestors and other parties. The demonstration consisted not only of protestors who blocked the roadway, but also of protestors who engaged in only legal activity. The offer of proof and the affidavits address the effectiveness of the demonstration as a whole and thus can not adequately lay the foundation that it was the criminal element of the protest which precipitated the claimed effects.

necessity and justifiability of the defendants' conduct must not rest upon considerations "pertaining only to the morality and advisability" of the statutory proscription alleged to have been violated by the defendant. § 18–1–702(2), 8B C.R.S. (1986).

Because the choice of evils defense is an affirmative defense, *see* § 18–1–710, 8B C.R.S. (1986), the defense may be raised either by the state's evidence or by the defendant's presentation of "some credible evidence on that issue." § 18–1–407(1), 8B C.R.S. (1986). Once the issue involved in an affirmative defense is raised, "then the guilt of the defendant must be established beyond a reasonable doubt as to that issue as well as all other elements of the offense" charged. § 18–1–407(2), 8B C.R.S. (1986).

There is a significant procedural difference between the choice of evils defense and other affirmative defenses. Before evidence relating to the choice of evils defense is presented to the jury, the trial court must first rule as a matter of law whether "the claimed facts and circumstances would, if established, constitute a justification" for the conduct charged against the defendant. § 18–1–702(2), 8B C.R.S. (1986). What this provision means is that the defendant in an *in-limine* hearing must demonstrate, by offer of proof, affidavit, or otherwise, that there is "some credible evidence" on each element of the choice of evils defense. If the defendant does so, then the trial court must permit the defendant to submit evidence on the affirmative defense to the jury and to permit the jury to consider that defense in its deliberations. *See People v. Dover*, 790 P.2d 834 (Colo.1990). As in the case of other affirmative defenses, the trial court must view the evidence in the light most favorable to the defendant in passing on these questions. *See People v. Andrews*, 632 P.2d 1012, 1016 (Colo.1981).

When I analyze the evidence under the aforementioned standard, I am satisfied that some credible evidence exists on each element of the choice of evils defense and that, therefore, the choice of evils defense should have been submitted to the jury for its consideration.

## II.

The first element of the choice of evils defense requires that a defendant's conduct be "necessary as an emergency measure to avoid an imminent public or private injury." The majority holds that the "necessity" element requires that a defendant's choice be based on a real emergency involving "specific and imminent grave injury," that all other potentially viable and reasonable alternatives have been pursued, and that the action taken have such a direct causal connection to the harm sought to be prevented as to bring about the abatement of that harm. Maj. op. at 609–610. The statutory text does not require that there be no alternatives other than the one taken by the defendant. Furthermore, the statute does not speak to whether there must be a direct causal connection between the defendant's conduct and the harm sought to be prevented. Nor does it require that the conduct actually succeed in abating the public or private injury. The stringent three-part standard on which the majority relies was adopted by this court in *People v. McKnight*, 626 P.2d 678, 681 (Colo.1981), which involved a prison escape and was developed in the interest of limiting any right of escape to truly exigent circumstances. We deal in the instant case, however, with an entirely different situation—a nonviolent citizen protest—and I believe *McKnight* is ill-suited to provide the controlling standard for resolving the question before us.

The rationale behind the choice of evils defense is grounded in the concept of necessity and can be simply stated: a defendant should not be punished when his or her conduct in violating the law prevents more evil than the violation causes. *See* Model Penal Code § 3.02, comment at 9–10 (1985). The concept of necessity does not demand one and only one response to the exclusion of all others. Necessity is often a matter of degree, involving competing values and alternatives, and its presence depends on both the likelihood and the

gravity of the harm sought to be prevented. If the harm is an appreciable one and the possible consequences grave, then the presence of necessity should not be resolved solely on the basis of the mathematical probability of the harm actually occurring. Although an allegation of generalized or speculative injury will not support a claim of necessity, the fact that the harm is not about to occur "immediately" is not to say that the harm may not be "imminent."

> [I]mminent danger is relative, and not absolute, and is measured more by the nature of consequences than by the lapse of time. . . . The law does not fix the distance of time between the justifiable defense and the mischief, for all cases, by the clock or the calendar. The chronological part of the doctrine of defense, like the rest of it, is a matter of reasonableness; and reasonableness depends upon circumstances.

*Aldrich v. Wright,* 53 N.H. 398, 403, 16 Am.Rep. 339, 345 (1873); *see* Pagliuca, *Choice of Evils in Colorado,* 18 Colo. Lawyer 1117 (1989).

We live in an environment in which one serious mistake in dealing with nuclear weapons and their production can be disastrous. Albert Einstein summed it up best when he wrote:

> Our world faces a crisis as yet unperceived by those possessing the power to make right decisions for good and evil. The unleashed power of the atom has changed everything save our modes of thinking and thus we drift toward unparalleled catastrophe. . . . [A] new type of thinking is essential if mankind is to survive and move toward higher levels.

R. Lapp, "The Einstein Letter That Started It All," New York Times, August 2, 1964, § E (Magazine) at 54 (quoted in Aldridge and Stark, *Nuclear War, Citizen Intervention, and the Necessity Defense,* 26 Santa Clara L.Rev. 299, 326 (1986)).

### A.

The majority views the dangers articulated in the affidavits submitted by the defendants as "long-term and speculative" and thus "insufficient to demonstrate that a specific, definite, and imminent injury is about to occur." Maj. op. at 611. This analysis, in my view, misses the mark. The peril of radiotoxic pollution need not arise from a single event, such as the calamity of a nuclear war, but can result from an on-going process over a prolonged period of time. The fact that the catastrophic consequences of a potential danger might not be immediate is not to say that the magnitude and probability of harm are not increasing at every point on the time line. The question of whether a danger is sufficiently imminent to merit action is not resolved simply by viewing the most serious consequences as long-term. Levitin, *Putting the Government on Trial: The Necessity Defense and Social Change,* 33 Wayne L.Rev. 1221, 1230 (1987).

The affidavits submitted by the defendants provide ample evidence that the chain of causation arising from radiotoxic pollution emanating from the Rocky Flats plant started in the past, has continued for many years, and still exists today. Carl J. Johnson, M.D., formerly the Director of the Jefferson County Department of Health, stated in his affidavit that the Rocky Flats plant had a major impact on the health of its employees and Denver area residents and continues to present a threat to the public health of the region.[1] Joseph Gold-

---

1. An abbreviated list of the harm described by Dr. Johnson includes the following: compared to all white males in Colorado, Rocky Flats nuclear workers have an eight-fold incidence of brain tumors and three-fold incidence of malignant melanoma; a Department of Energy (DOE) follow-up study of white males at Rocky Flats in 1987 of Dr. Johnson's earlier study found a 7.7–fold excess of lymphatic sarcoma, 3.3 times more esophageal cancer than expected, 80% more gastric cancer, 3.7 times more prostatic cancer; exposures to the surrounding population began in 1953 and peaked in 1957 when an explosion blew out all 600 plus industrial filters in the main smokestack; a 1969–71 study found concentrations of plutonium in the Denver area drinking water 7,000 to 40,000 times the background level of world-wide fallout; a DOE monitoring station near Rocky Flats recorded the highest air concentrations of plutonium reported in the world for every month measured; leukemia rates for children in Jefferson County were below the U.S. rate in the five year period before 1953, but increased to about twice the U.S. rate after 1957; a study per-

field, a chemical and environmental engineer, also submitted an affidavit on the hazard created by the Rocky Flats plant.[2] It was Goldfield's opinion, based on a review of documents submitted by Rockwell International and the Department of Energy to the Colorado Department of Health, that the Rocky Flats fluidized bed incinerator, which was designed to dispose of materials contaminated with low levels of plutonium, presents significant hazards, from both the possibility of an explosion and from normal emissions of radiotoxic materials, to Rocky Flats workers and the surrounding Denver metropolitan population. John Candler Cobb, Professor Emeritus of Preventative Medicine and Community Health at the University of Colorado Health Sciences Center, submitted an affidavit in which he stated that he conducted an investigation for the Environmental Protection Agency concerning human plutonium burdens in people who have lived near Rocky Flats from 1975 until 1982. It was his opinion that, on the day of the defendants' demonstration and afterwards, the Rocky Flats plant presented and continues to present a clear and imminent danger to Colorado front range citizens from both past actual releases of radioactive materials and from potential future accidents, both large and small. The inevitability of human error, in his view, constitutes a major factor in the risk of nuclear accidents. Cobb's affidavit further stated that, due to poor planning two decades ago, plutonium is currently blowing from the southeast corner of Rocky Flats.

The sworn statements of these qualified and respected experts certainly qualify as "some credible evidence" that, for purposes of the choice of evils defense, the danger from the Rocky Flats plant was imminent at the time of the defendants' conduct.

### B.

The majority also concludes that the defendants did not "allege facts that, if proved, would establish that the protest brought about the termination or prevention of the harm they were protesting." Maj. op. at 610. This analysis injects a novel element of "sufficiency" into the necessity calculus and results in limiting the choice of evils defense only to those defendants who succeed in their efforts in preventing the injury against which their actions are directed.

Citizen protests, such as the one in this case, are often part of a broader movement to extricate the government from a policy or a course of conduct that is perceived to be inimical to the public welfare. While an individual protest may not be sufficient in itself to terminate the perceived harm, the combined effect of several protests well might effectuate a significant change in or termination of the policy or conduct against which a particular protest is directed. Levitin, 33 Wayne L.Rev. at 1234–37. The defendants' assertion that their action, in combination with the actions of others, might accelerate a political process ultimately leading to the elimination of the perceived harm should not be rejected out of hand. On the contrary, the issue of necessity should turn on whether the evidence, when viewed in a light most favorable to the defendants, will support a finding that defendants' conduct was reasonably calculated to have a significant impact on the perceived danger which the defendants sought to prevent. *See United States v. Simpson,* 460 F.2d 515 (9th Cir. 1972).

The affidavits submitted by the defendants satisfied this standard. Eight ex-

---

formed in 1979–81 found an increase in age-adjusted cancer incidence in the Denver metro area of 15%, which was 61% greater than the national trend.

**2.** Mr. Goldfield stated that potential failure exists in the incinerator design, exemplified by three fires which occurred during testing of the incinerator with non-radioactive materials. If such fires had occurred during incineration of

radioactive materials, it is possible that emission of radioactive materials into the atmosphere would have occurred. If such fire occurred and an explosion resulted after six months of operation, the incinerator would have released an amount of plutonium into the atmosphere 28 trillion times as great as the DOE prediction of the yearly emission rate of the incinerator.

perts from such diverse fields as the law, the social and political sciences, and aerospace engineering offered opinions that the defendants' conduct was reasonably calculated to prevent the evil of environmental pollution from radiotoxic substances. Haywood Burns, Dean of the City University of New York School of Law, offered the opinion that the protest "appears to be reasonably calculated to have an ultimate impact on the Rocky Flats plant which seeks to be permitted to contaminate and threaten with contamination[ ] the soil, air and groundwater of people who live in the area." Professor Elise Boulding, an expert in the social sciences, offered the opinion that "the demonstration was reasonably calculated to prevent or mitigate the evils of pollution hazards to the surrounding population." Robert C. Aldridge, an aerospace engineer, offered the opinion that the defendants reasonably believed that a causal connection exists between citizen intervention and prevention of the harm.

### C.

The majority also holds that the defendants failed to offer "facts that, if proven, would show the defendants tried other potentially viable and reasonable alternatives, or that any other alternatives would be futile." Maj. op. at 610. In addition to lacking support in the statutory text, this requirement virtually eliminates the availability of the choice of evils defense in challenges to governmental policies.

> In the real world, it is impossible to predict what effect alternative actions would have had.... The existence of alternatives is merely an argument that the jury should consider relevant to the issue of necessity, but it should rarely absolutely preclude the use of the defense. For example, a court may consider bringing an action before a regulatory agency a viable legal alternative, when in fact it is futile, if that agency has been "captured" by the regulated industry. It would be misleading for the court to call such an action an alternative. Moreover, many industries have unregulated elements....

> To suggest that there are always legal alternatives available in political protest cases is to assert that there can never be a necessity defense in such cases.

*Levitin,* 32 Wayne L.Rev. at 1233. In contrast to the majority, I view the existence of alternatives as merely one factor, and not necessarily conclusive, in considering whether the defendants' action was necessary.

The affidavits submitted by the defendants provide "some credible evidence" that resorting to other alternatives would be futile. George A. Johnson, attorney at law, and Arthur Kinoy, Professor of Law at Rutgers University School of Law, stated in their affidavits that, although conventional means exist, none of the conventional methods have brought about results eliminating the serious dangers of radiotoxic pollution. Robert C. Aldridge, an aerospace engineer, stated in his affidavit that "[n]o reasonable traditional alternatives are available to stop or prevent the harm" and that "a history of futile attempts to use accepted means makes any anticipated results from such means alone illusory." Frances A. Boyle, Professor of Law at the University of Illinois, echoed the same theme. Howard Zinn, Professor of Political Science at Boston University, stated in his affidavit that "conventional means alone are insufficient to effect such substantive changes." Finally, Daniel Ellsberg, an economist and political activist, presented an affidavit in which he stated that in the domain of nuclear policy, the " 'normal' legal processes of democracy, by themselves, [have not] functioned adequately—or even been permitted to operate, in terms of openness and public awareness—to protect American citizens and other humans from vast, in some cases unprecedented and unlimited, risks of harm." Such opinion evidence clearly rises to the level of "some credible evidence" on the futility of other alternatives to the defendants' conduct.

### III.

The second element of the choice of evils defense is that the public or private injury

was about to occur because of a situation occasioned or developed through no conduct of the defendant. Clearly, the injury that the defendants sought to prevent was not "occasioned or developed" by any conduct on their part, but rather had its source in the pollution emanating from the Rocky Flats plant. It cannot reasonably be disputed, therefore, that the defendants' offer of proof satisfied the second element of the choice of evils defense.

## IV.

The choice of evils defense also requires that the public or private injury sought to be prevented be of sufficient gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding the public or private injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the statute which the defendants were accused of violating. This requirement echoes the principle that the defendants' conduct must promote "some value higher than the value of literal compliance with the law." G. Williams, *The Criminal Law*, § 229 (2nd ed. 1970). The majority does not address this element, as it concludes that the defendants failed to satisfy the other elements of the choice of evils defense. Since I believe the defendants have satisfied the other elements of the statutory defense, I will address the issue of competing values.

The choice of evils defense contemplates an objective standard in determining whether the injury sought to be prevented clearly outweighs the injury caused by the defendants' violation of the criminal law. *See Model Penal Code* § 3.02, comment at 12; G. Williams, *The Criminal Law*, § 239 (while "necessity is subjective as to its facts, it is objective as to its values"). Section 18–1–702(2), however, does not specify the manner in which the balancing of values is to be resolved. In light of this statutory silence, it is appropriate to look to the law governing the respective functions of the court and jury in resolving that question.

The issue of competing values is for the jury as long as there is evidence which, when viewed in the light most favorable to the defendant, is sufficient to permit a reasonable trier of fact to conclude that the relative value of a defendant's conduct, according to ordinary standards of intelligence and morality, outweighs the value underlying the statutory proscription violated by the defendant. *See* Arnolds and Garland, *The Defense of Necessity in Criminal Law: The Right to Choose the Lesser Evil*, J.Crim.Law & Criminology 289, 296 (1974). This standard is nothing more than a recognition of the fact that one's choice of value does not occur under ideal conditions where right and wrong are obvious, but under circumstances where the right most often must be wrenched from less than ideal alternatives. In most cases, therefore, the issue of whether the value of a defendant's action preponderates over the value of obeying the statutory proscription will be a question for the jury to resolve.

In the present case, the affidavits submitted on behalf of the defendants satisfied the threshold of "some credible evidence" on the issue of competing values. The particular injury pertinent to the choice of evils defense in this case was the prevention of radiotoxic pollution from explosion or from normal emissions from the Rocky Flats plant. In contrast, the injury caused by the defendants' conduct consisted of obstructing a highway and disobeying a lawful order of a police officer to remove themselves from that particular location.

The defendants' conduct in this case did not rest upon considerations pertaining to the morality and advisability of the statutory proscriptions which they were accused of violating, but instead was directed to the completely separate concern over what they perceived to be an imminent public injury. The jury might conclude under these circumstances, or might not for that matter, that the balance of values in this case weighed in favor of the defendants.

The jury, after all, is the safety valve which, by its own inherent structure, permits society to accommodate itself to its own internal stresses and strains.

I would reverse the judgment of conviction and remand the case for a new trial.