24CA0704 Peo v Cannon 09-18-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0704
Archuleta County District Court No. 21CR125
Honorable Justin Patrick Fay, Judge
Honorable Kimberly Karn, Judge
Honorable Jeffrey R. Wilson, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Cody Ross Cannon,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE KUHN
J. Jones and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 18, 2025

Philip J. Weiser, Attorney General, Carmen Moraleda, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Seth Johnson, Alternate Defense Counsel, Pueblo, Colorado, for Defendant-
Appellant

¶ 1    Defendant, Cody Ross Cannon, appeals the judgment of conviction entered on a jury verdict finding him guilty of possession with the intent to sell or distribute methamphetamine. We affirm.

## I.    Background

¶ 2    We glean the following factual background from the record and the evidence that the jury heard at trial.

¶ 3    In January 2021, the Colorado State Patrol Smuggling and Trafficking Interdiction Unit began investigating Cannon on suspicion that he had been dealing methamphetamine. Posing as a potential drug buyer, Sergeant Mark Parsons initiated a text exchange with Cannon that lasted several days. During the exchange, Sergeant Parsons offered to pay $250 for an "8-ball," roughly three and a half grams of methamphetamine. Cannon responded that he had "half [of] what [Sergeant Parsons] wanted" and that he was planning to get more product from his supplier.

¶ 4    Still unaware that he was corresponding with an undercover officer, Cannon wrote to Sergeant Parsons the next night that he was on his way back from the supplier, that he had the product, and that the "[p]rice did go up [a] little but [was] still worth it." Cannon also sent a photo of a plastic baggie containing several

chunks of a crystalline substance. Sergeant Parsons communicated this information to his fellow officers and provided a description of Cannon's vehicle. Shortly thereafter, a state trooper stopped Cannon's pickup truck after observing that he had crossed over the shoulder line and that the vehicle had no license plate light.

¶ 5 A K-9 unit responded to the scene to conduct a drug sniff of the exterior of the truck. The dog, trained to detect the odor of illegal drugs, including methamphetamine, alerted to the presence of narcotics. Following the alert, Cannon admitted that he had methamphetamine in his truck. During a subsequent search of the vehicle, officers found more than twenty-eight grams of a substance containing methamphetamine and an unopened digital scale.

¶ 6 The prosecution charged Cannon with possession with the intent to sell or distribute between 7 and 112 grams of methamphetamine, a level 2 drug felony. *See* § 18-18-405(1)(a), (2)(b)(I)(B), C.R.S. 2025. After a two-day trial, the jury found him guilty of the charged offense. The trial court sentenced Cannon to three years of supervised probation and ninety days in jail, suspended upon his successful completion of probation. The court

also imposed various costs and fees, including a mandatory $3,000 drug offender surcharge under section 18-19-103(1)(b), C.R.S. 2025.

## II.    Analysis

¶ 7    On appeal, Cannon contends that the trial court reversibly erred by (1) not allowing his trial counsel to withdraw from the case, in violation of his constitutional right to representation; and (2) not conducting an evidentiary hearing to consider whether the drug offender surcharge should be waived because of his indigency. We address each of these contentions in turn.

### A.    Defense Counsel's Motion to Withdraw

¶ 8    Cannon contends that the court erred by denying his trial counsel's motion to withdraw after determining that the appointment of substitute counsel wasn't warranted. We disagree.

#### 1.    Applicable Law and Standard of Review

¶ 9    The United States and Colorado Constitutions guarantee criminal defendants the fundamental right to effective assistance of counsel. *See* U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16; *People v. Greer*, 2022 CO 5, ¶ 21; *People v. Lancaster*, 2018 COA 168, ¶ 10. "The right to counsel encompasses both the right to a

3

retained attorney for a defendant who is financially able to pay for legal representation, and the right to a court-appointed counsel for an indigent defendant." *Greer*, ¶ 21 (quoting *People v. Alengi*, 148 P.3d 154, 159 (Colo. 2006)).

¶ 10 However, an indigent defendant isn't entitled to a court-appointed attorney of their choice. *People v. Arguello*, 772 P.2d 87, 92 (Colo. 1989); *People v. Travis*, 2019 CO 15, ¶ 8. Accordingly, a defendant will be appointed substitute counsel only upon a showing of good cause, "such as a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict that may lead to an apparently unjust verdict." *People v. Kelling*, 151 P.3d 650, 653 (Colo. App. 2006). Put differently, a trial court must appoint substitute counsel to a defendant like Cannon only if the court determines that the defendant has some well-founded reason for believing that the appointed attorney can't competently represent him. *People v. Rodriguez*, 2022 COA 98, ¶ 62.

¶ 11 In making that determination, a trial court must consider (1) the timeliness of the request at issue; (2) the adequacy of the court's inquiry into the defendant's complaint; (3) whether the attorney-client conflict was so great that it resulted in a total lack of

4

communication or otherwise prevented an adequate defense; and (4) whether the defendant substantially and unreasonably contributed to the underlying conflict. *People v. Bergerud*, 223 P.3d 686, 695 (Colo. 2010). If the court properly determines that the request must be denied, then "the court can insist that the defendant choose between continued representation by existing counsel and appearing pro se." *Id.* at 693 (quoting *Arguello*, 772 P.2d at 94).

¶ 12     We review for an abuse of discretion a trial court's decision not to appoint a new attorney to a defendant whose existing attorney moved to be allowed to withdraw from the case. *See Rodriguez*, ¶ 61 (noting that we review for an abuse of discretion a *defendant's* request for substitution of counsel); Crim. P. 44(c) ("[W]ithdrawal of a lawyer in a criminal case is a matter within the sound discretion of the court."). A court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair, or is based on a misunderstanding or misapplication of the law. *People v. Johnson*, 2016 COA 15, ¶ 29.

## 2. Additional Background

¶ 13    In July 2023, the trial court appointed Cassandra Zobel from the Office of Alternate Defense Counsel to represent Cannon. Zobel was Cannon's third court-appointed attorney; a public defender and a different alternate defense counsel had already withdrawn from the case due to, respectively, a breakdown in communication and an unspecified ethical conflict with Cannon. Roughly four months later, JayAnn Villalobos entered her appearance as co-counsel for Cannon.

¶ 14    Then, on the Friday afternoon before the start of the scheduled Monday trial, Zobel submitted a "Motion for a Hearing to Address [an] Ethical Conflict Pursuant to [*Bergerud*]." In the motion, she asserted that "[c]ounsel and Mr. Cannon have experienced a complete breakdown in communication and have developed an ethical conflict that makes continued representation by his current attorneys impossible."[1] Zobel also asked for an ex parte hearing in

---

[1] It is somewhat unclear to what extent the motion was intended to cover Villalobos as well as Zobel. However, as we note below, Cannon limits his argument to Zobel's representation, so we need not decide this issue.

front of a different judge. The court granted this request on the morning of trial.

¶ 15     At the hearing, Zobel said that Cannon had made it difficult for her to engage in consistent and productive communication with him. She also asserted that Cannon's desire to testify at trial would preclude her from presenting an adequate defense and, therefore, would render her assistance ineffective. Zobel said that Cannon insisted on testifying in order to admit committing the crime but provide a justification for his actions to the jury. Specifically, Cannon had told her that he had committed the crime with the intention of obtaining a court-appointed counsel who would then represent him in an unrelated civil dispute involving access to his home.

¶ 16     Zobel further explained that, if Cannon were to repeat these statements on the stand, she would have to run a choice of evils affirmative defense under section 18-1-702, C.R.S. 2025. But in her view, that affirmative defense was at odds with the theory of defense that she intended to present at trial — that the prosecution failed to prove beyond a reasonable doubt that Cannon *intended* to sell or distribute the drugs he was found with. And because she

7

wouldn't know until the conclusion of the prosecution's case-in-chief whether Cannon would exercise his constitutional right to testify, Zobel asserted that it was impossible for her to choose a defense prior to trial.

¶ 17    During the conflict hearing, the court also questioned Cannon. In response to the court asking whether he was dissatisfied with his attorneys' legal advice or representation, Cannon said, apparently referring to Zobel, "No, . . . she's been the best . . . ." He said that he wanted to have a trial and not plead guilty to the charged offense because, among other things, he wanted the jury to know why "[he] did what [he] did." But when the court asked him whether he was "steadfast in testifying" at trial, Cannon said, "I would -- I don't -- I don't know."

¶ 18    The court denied counsel's motion to withdraw after applying the four-factor test from *Bergerud*. The court reasoned that (1) the motion was "particularly untimely" because Zobel had submitted it "very much [on] the eve of trial"; (2) the court's inquiry into the nature of the grievance revealed that Cannon "was largely unable to articulate any dissatisfaction with [his] representation"; (3) there was no total lack of communication between Cannon and Zobel

given that she had spent a substantial number of hours on the case and had met with him multiple times before the trial; (4) any difficulty in communication was "substantially and unreasonably" the result of Cannon's own conduct based on his frustration with Zobel's recommended trial strategy and reconciling that strategy with his constitutional rights to decide whether to testify, enter a guilty plea, and represent himself at trial; and (5) the case must be expeditiously resolved considering its age and significant prior delays.

¶ 19 Following this ruling, Cannon informed the trial court that he did not wish to proceed pro se. Accordingly, both Zobel and Villalobos represented Cannon for the trial's duration.[2]

---

[2] On appeal, Cannon only contends that the court should have allowed Zobel to withdraw as his counsel. Accordingly, we limit our analysis to that issue and do not consider how Villalobos's representation impacted the trial or Cannon's constitutional right to counsel or any other right. *See Galvan v. People*, 2020 CO 82, ¶ 45 (noting that courts should only address questions presented by the parties).

### 3. The Court Didn't Abuse Its Discretion by Denying the Motion to Withdraw from the Case

¶ 20     We conclude that the court didn't abuse its discretion by denying counsel's motion to withdraw because the court properly applied the *Bergerud* factors in reaching its decision.[3]

### a. The Motion Was Untimely

¶ 21     For starters, we agree with the court that counsel's motion — filed on the Friday before the trial's Monday start date — was untimely. Indeed, Cannon admits that fact in his briefing. But it's also true that, in evaluating the timeliness of a request for new counsel, a trial court should consider not only "whether the defendant's request was late in coming" but also "the cause for any delay and whether responsibility for the delay lies with the defendant or with his lawyers." *Bergerud*, 223 P.3d at 695.

---

[3] We agree with the People that this case is factually distinguishable from *People v. Bergerud*, 223 P.3d 686 (Colo. 2010), because Cannon didn't request substitution of counsel. Nonetheless, his attorney filed the motion to withdraw premised on her obligation under *Bergerud* to bring a total breakdown in communication to the court's attention. *See* 223 P.3d at 698. And the outcome of a successful motion would have been either the appointment of substitute counsel or Cannon proceeding pro se. We thus conclude that the four-prong *Bergerud* test is the appropriate framework under which to review the court's ruling.

Cannon argues that the delay here was solely attributable to Zobel because she knew "from the inception of her representation" that he wanted to testify in a manner inconsistent with her preferred defense strategy. We're not persuaded.

¶ 22    This argument disregards the fact that the record shows that, in the weeks leading up to his trial, Cannon was aware that the issue underlying counsel's subsequent motion to withdraw remained unresolved. *See id.* at 706 (noting that, in assessing the timeliness factor, the court should consider whether the defendant "should have known the dispute remained unresolved and failed to bring the conflict to the attention of the court earlier despite opportunity to do so").

¶ 23    During the conflict hearing, Zobel said that her and Cannon's disagreement over which theory of defense to run at trial started shortly after she was appointed to represent him. She said that she had made multiple unsuccessful attempts to reconcile Cannon's purported need for legal representation in the unrelated civil property dispute with her objective of presenting what she believed was the strongest defense. For example, Zobel recounted how she had approached Cannon roughly two weeks before the trial date to

11

explain why they should argue that the prosecution had failed to prove the intent element of the charged offense. However, after Cannon told her that he nonetheless "wanted to testify and tell his story," Zobel informed him that "potentially the only possible defense . . . could be the affirmative defense of necessity but that [she] needed to do more research about that."

¶ 24    Regardless, "both the defendant and his attorneys have an obligation to bring conflicts to the attention of the court at the earliest practicable time, lest requests for new counsel or time to resolve such conflicts be used to obstruct the orderly administration of justice." *Id.* at 697. Here, there's no indication in the record that Cannon lacked the opportunity to inform the court of his disagreement with Zobel because she undermined his earlier attempts to raise his disagreement about the defense should he have wanted to do so. *See id.* at 706 (noting that a defendant's untimely request for substitution of counsel should be excused if the court determines that the defendant's lawyers "stifled" his attempts to bring the matter to the court's attention earlier). Cannon had the opportunity to alert the court of the alleged conflict and wasn't prevented from doing so by his counsel. And both

12

parties agree with the court's finding that counsel's motion to withdraw, filed on the eve of trial, was untimely. We thus perceive no error in the way the court weighed this factor.

### b. The Court Adequately Examined the Circumstances Underlying the Motion to Withdraw

¶ 25 The court also adequately inquired into the circumstances surrounding the withdrawal request. The court questioned both Zobel and Cannon about the alleged ethical conflict and breakdown in communication between them. The court spoke to them about (1) Cannon's desire to testify and how his potential testimony would affect the trial strategy; (2) their prior meetings regarding the case; and (3) how they had gotten along before trial. But while Zobel alleged that her relationship with Cannon was strained, Cannon couldn't provide any reason why the court should allow her to withdraw from the case. Indeed, as the court noted, Cannon was not only "unable to articulate dissatisfaction with [his] representation" but also had said that Zobel had been "the best of the attorneys that he'[d] been provided."

¶ 26 Thus, the second factor of the *Bergerud* test likewise supported the court's denial of the motion to withdraw.

### c.   The Claimed Conflict Didn't Result in a Total Lack of Communication or Prevent Cannon from Presenting an Adequate Defense

¶ 27    Next, there was no showing of a severe conflict between Cannon and his counsel that resulted in a total lack of communication or otherwise prevented the presentation of an adequate defense. A total breakdown in communication must be "evidenced by proof 'of a severe and pervasive conflict with [the defendant's] attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible.'" *Rodriguez*, ¶ 63 (alteration in original) (quoting *People v. Faussett*, 2016 COA 94M, ¶ 24). As noted above, the alleged conflict centered on Cannon's desire to testify and explain to the jury that he committed the crime believing that a public defender or other court-appointed attorney in the resulting criminal case would be able to assist him with his civil property dispute. Zobel thought that, while this testimony could potentially support an affirmative defense of choice of evils, though that was also a "very long shot," Cannon's statements would essentially constitute an admission of guilt that would be irreconcilable with her argument

that the prosecution had failed to prove an element of the charged crime.

¶ 28    But despite their discord over the theory of defense, the record supports the court's finding that there was no total breakdown in communication between Cannon and Zobel.  To the contrary, Zobel said that about a month and a half after her appointment as Cannon's counsel, they met in person "for several hours over two days."  She counted nine phone calls with Cannon over the roughly five-month period that she had been representing him.  In total, Zobel had spent 104 billable hours on the case by the time of the conflict hearing.  Accordingly, while Zobel also detailed some difficulties that she had encountered in trying to engage Cannon in consistent and productive conversations regarding his case, the record from the conflict hearing demonstrates that any breakdown in communication was not substantial enough to show a "severe and pervasive conflict" or that Cannon "had such minimal contact with [his] attorney that meaningful communication was not possible."  *Id.* (citation omitted).

¶ 29    Additionally, the conflict underlying counsel's motion to withdraw didn't prevent Cannon from presenting an adequate

defense: he didn't intend to sell or distribute the methamphetamine he was found with. Cannon contends that because his and Zobel's disagreement originated from his intent to exercise his constitutional right to testify, the court failed, among other things, to "assess whether any improper actions [had] already resulted in a constitutional violation." Cannon posits that had the court made such an assessment, it would have determined that Zobel's actions undermined his ability to testify in support of his theory of defense. According to Cannon, those actions included Zobel's failure to (1) timely endorse the choice of evils defense and (2) request a pretrial ruling on the applicability of that defense to the circumstances of his case. *See* § 18-1-702 (providing that, for a choice of evils defense to be "submitted for the consideration of the jury, the court shall first rule as a matter of law whether the

16

claimed facts and circumstances would, if established, constitute a justification").[4]

¶ 30    It's true that counsel can't prevent her client from "making the fundamental choices extended to [the client] by the Constitution," including the client's right to testify in his own defense. *Bergerud*, 223 P.3d at 695. Consequently, a trial court must appoint new

---

[4] While we resolve this appeal on the grounds that Cannon's alleged conflict with Zobel didn't warrant her withdrawal from the case under the *Bergerud* test, we note that Cannon's preferred theory of defense underlying this conflict fails on the merits as a matter of law. The statutory choice of evils affirmative defense requires a "defendant [to] establish that the crime committed was *necessary* to prevent an imminent injury." *Andrews v. People*, 800 P.2d 607, 610 (Colo. 1990). Thus, for that defense to be presented to the jury, a defendant must establish in an offer of proof that

> (1) all other potentially viable and reasonable alternative actions were pursued, or shown to be futile[;] (2) the action taken had a direct causal connection with the harm sought to be prevented, and that the action taken would bring about the abatement of the harm[;] and, (3) the action taken was an emergency measure pursued to avoid a specific, definite, and imminent injury about to occur.

*Id.* (footnotes omitted). Cannon doesn't explain — and we don't see — how his claim that he committed the crime for the purposes of obtaining legal representation in an unrelated civil property dispute could possibly satisfy these elements of the choice of evils defense.

17

counsel to a defendant in the situation where existing counsel's actions so undermine the defendant's ability to testify that the right is "reduce[d] . . . to a nullity." *Id.* at 702.

¶ 31     But here, at the conclusion of the prosecution's case, Cannon was provided with a written advisement form regarding his right to testify, consistent with *People v. Curtis*, 681 P.2d 504, 514-15 (Colo. 1984). Cannon initialed and signed the advisement after having ample opportunity to confer with his counsel. On the form, he expressly indicated that he didn't want to testify at trial.

¶ 32     Then, the trial court went over the written *Curtis* advisement with Cannon. After Cannon confirmed under oath that he understood every element of the advisement, the trial court found that his waiver of the right to testify was knowing, intelligent, voluntary, and made "without force or undue influence." Thus, Cannon can't now contend on appeal that Zobel should have been allowed to withdraw from the case based on a conflict between her preferred trial strategy and his right to testify when he ultimately waived that right. *See Kelling*, 151 P.3d at 656 (noting that in determining whether to grant a defendant's request for substitute

counsel, the trial court is not limited to the facts as they existed at the time the defendant made that request).

      d.     Cannon Substantially and Unreasonably Contributed to the Conflict with His Attorney

¶ 33     Finally, we agree with the court's determination regarding the fourth *Bergerud* factor that Cannon substantially and unreasonably contributed to the issues underlying his counsel's motion to withdraw from representing him. Specifically, to the extent a breakdown in communication existed, the record shows that it occurred in large part due to Cannon's own actions. After all, Zobel said that Cannon had failed to show up for two in-person meetings; he had stopped "communicating with [her] for long stretches of time despite repeated voice mails [and] text messages"; and he had hung up on her multiple times after expressing disagreement with her legal advice.

¶ 34     For all these reasons, then, we conclude that the court didn't abuse its discretion by denying Cannon's counsel's motion to withdraw from the case.

19

## B.    The Drug Offender Surcharge

¶ 35    Cannon contends, and the People agree, that the trial court erred by not conducting an evidentiary hearing to address his request for a waiver of the drug offender surcharge. We disagree with the parties because we perceive no error in the court's decision not to waive the surcharge.

### 1.    Applicable Law and Standard of Review

¶ 36    In relevant part, section 18-19-103(1)(b) provides that a drug offender who is convicted of a level 2 drug felony shall be required to pay a $3,000 surcharge. The drug offender surcharge is statutorily mandated, meaning that a trial court's failure to order it at sentencing renders the defendant's sentence illegal and subject to correction at any time under Crim. P. 35(a). *Yeadon v. People*, 2020 CO 38, ¶¶ 1, 15; *Waddell v. People*, 2020 CO 39, ¶¶ 1, 20. However, a trial court also has the authority to waive any portion of the drug offender surcharge if, after a hearing, the court determines by clear and convincing evidence that the defendant is financially unable to pay the waived portion of the surcharge. § 18-19-103(6)(a) and (b).

¶ 37    We review for an abuse of discretion a trial court's decision whether to waive the drug offender surcharge.[5]  *See Waddell*, ¶ 18 (noting that a trial court "is vested with discretion" to waive the surcharge if the defendant proves inability to pay).

### 2.    The Trial Court Didn't Abuse Its Discretion by Declining to Waive Cannon's Drug Offender Surcharge

¶ 38    At sentencing, the trial court imposed the mandatory $3,000 drug offender surcharge in addition to other costs and fees, but it set a hearing to consider whether any portion of that amount should be waived due to Cannon's claim of indigency.  The court informed Cannon that he could bring to the hearing "any financial information [he had] in terms of [his] income" to establish that he was financially unable to pay the surcharge.

---

[5] Citing *Yeadon v. People*, 2020 CO 38, ¶ 6, and *Waddell v. People*, 2020 CO 39, ¶ 10, the People concede Cannon's assertion that we should review this issue de novo.  But those cases involved the legality of a defendant's sentence, an issue that we do review de novo.  *Magana v. People*, 2022 CO 25, ¶ 33.  Because Cannon's challenge to the drug offender surcharge doesn't implicate the legality of his sentence or require us to resolve another legal question, we disagree with the parties' assertion that de novo review applies.  *See People v. Backus*, 952 P.2d 846, 850 (Colo. App. 1998) ("[A]n appellate court is not bound by the concessions of the parties regarding the applicable law.").

¶ 39 At the hearing, which was held a day earlier than initially set and in front of a judge who didn't preside over the trial and sentencing, a probation officer provided information about Cannon's progress on probation. The probation officer said, "[Cannon is] actually doing very well. He's ran into some barriers, but he's staying well in communication with us and overcoming the barriers where he can and communicating when he can't. So he would be 100 percent in compliance as of right now." But the probation officer also said that because Cannon had lost his job, "it would be very hard for him to come up with [enough] money" to pay the costs, fees, and the surcharge.

¶ 40 The trial court ordered that "anything that can be waived in terms of costs and fees [is] waived, including [Cannon's] probation supervision fees." "As to the drug surcharge," the court said, "I'm going to leave that where it is for right now. If [Cannon] continue[s] to stay unemployed and do well on probation, [Cannon's] attorney can file a motion [to waive the surcharge] and I will seriously consider that."

¶ 41 At the outset, we agree with Cannon's assertion that even though the trial court set a hearing where he would have the

opportunity to prove, by clear and convincing evidence, that he was financially unable to pay the drug offender surcharge, no such hearing occurred. As the above record reveals, the hearing that the court held was brief and didn't involve any presentation of evidence regarding Cannon's claimed indigency. But that doesn't necessarily mean that the court erred by refusing to waive the surcharge.

¶ 42    "[W]hen a defendant presents clear and convincing evidence at a hearing that he lacks the financial means to pay any portion of the drug offender surcharge, the trial court is vested with discretion to waive that portion of the surcharge." *Yeadon*, ¶ 13. And if a "trial court . . . d[oes] not hold the necessary hearing or make the necessary finding, it ha[s] no choice but to impose the mandatory surcharge." *Waddell*, ¶ 18. But it is not true that if a court holds a hearing or finds that a defendant lacks financial means to pay, then it *must* waive the surcharge. In other words, a trial court has authority to not waive a drug offender surcharge even if a defendant like Cannon can establish that he's currently financially unable to pay the surcharge.

¶ 43    Here, the information received by the trial court during the hearing suggested that Cannon lacked the financial means to pay

23

his $3,000 obligation. His probation officer said that he was unemployed, and his counsel said that he had no other income and had been struggling with housing.

¶ 44 Nonetheless, we discern no abuse of discretion in the trial court's decision not to immediately waive the surcharge. While Cannon was unemployed at the time of the hearing, his counsel said that he had lost his job sometime after sentencing, which had occurred just over a month earlier. Similarly, while the probation officer said that Cannon had complied with all aspects of his probation, the officer also indicated that Cannon had been on probation only for "a couple [of] months by now, maybe a month and a half." This record shows that Cannon's unemployment and compliance with the conditions of his probation were still recent occurrences at the time of the hearing. The trial court didn't indicate that it was denying the surcharge based on its perception of Cannon's financial situation. Instead, it indicated that, essentially, it wanted to see if he was unable to find a job and how he did on probation. And the court told Cannon that, if the circumstances supporting a waiver persisted, he could again seek a waiver of the surcharge. The court's approach wasn't manifestly

arbitrary, unreasonable, or unfair, nor was it a misapplication of the law. *See Johnson*, ¶ 29.

¶ 45 Under these circumstances, we conclude that the trial court didn't abuse its discretion by declining to waive Cannon's $3,000 drug offender surcharge.

## III. Disposition

¶ 46 The judgment is affirmed.

JUDGE J. JONES and JUDGE MOULTRIE concur.